**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **WALTER DEAN and DEAN WOLLENZIEN,** | ) | |
| **individually, and on behalf of those similarly situated,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:  19-cv-02694** |
| | ) | |
| **NATIONAL PRODUCTION WORKERS UNION** | ) | |
| **SEVERANCE TRUST PLAN; NATIONAL** | ) | |
| **PRODUCTION WORKERS UNION 401(K)** | ) | |
| **RETIREMENT PLAN; JOSEPH VINCENT** | ) | |
| **SENESE, ROSIE GIBSON, JOSE DIAZ, JAMES** | ) | |
| **MALLOY, SCOTT GORE, individually and in their** | ) | |
| **capacities as THE BOARD OF TRUSTEES of the** | ) | |
| **NATIONAL PRODUCTION WORKERS UNION** | ) | |
| **SEVERANCE TRUST PLAN and the NATIONAL** | ) | |
| **PRODUCTION WORKERS UNION 401(K)** | ) | |
| **RETIREMENT PLAN; JAMES MELTREGER,** | ) | |
| **individually and in his capacity as PLAN MANAGER** | ) | |
| **of the NATIONAL PRODUCTION WORKERS** | ) | |
| **UNION SEVERANCE TRUST PLAN and the** | ) | |
| **NATIONAL PRODUCTION WORKERS UNION** | ) | |
| **401(K) RETIREMENT PLAN,** | ) | |

**Defendants.**

## CLASS ACTION COMPLAINT

Plaintiffs, Walter Dean and Dean Wollenzien, by and through their attorneys, Dowd,

Bloch, Bennett, Cervone, Auerbach & Yokich, on behalf of all others similarly situated and by

way of their class action complaint against Defendants National Production Workers Union

Severance Trust Plan ("NPWU Severance Plan" or "Severance Plan"); National Production

Workers Union 401(k) Retirement Plan ("NPWU 401(k) Plan" or "401(k) Plan"); Joseph

Vincent Senese, Rosie Gibson, Jose Diaz, James Malloy, Scott Gore, individually and in their

capacities as the Board of Trustees of the National Production Workers Union Severance Trust

Plan and the National Production Workers Union 401(k) Retirement Plan ("Board of Trustees");
and James Meltreger, individually and in his capacity as Plan Manager of the National
Production Workers Union Severance Trust Plan and National Production Workers Union 401(k)
Retirement Plan ("Plan Manager"), state as follows:

## JURISDICTION, VENUE, AND PARTIES

1.      Plaintiffs bring this action under Sections 502(a)(1)(A), (a)(1)(B), (a)(2), and
(a)(3) of the Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(A),
(a)(1)(B), (a)(2), and (a)(3), on behalf of themselves and all others similarly situated.

2.      This Court has jurisdiction pursuant to 29 U.S.C. § 1132(e) and (f), 29 U.S.C. §
1451, and 28 U.S.C. § 1331.

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 29 U.S.C. §
1132(e), as a substantial part of the events giving rise to Plaintiffs' claims occurred within this
District, Defendants reside in this District, and the breaches alleged occurred in this District.

4.      All named plaintiffs ("Plaintiffs"), reside in Will County, Illinois.

5.      Plaintiffs have, at all relevant times, been employed by Parsec, Inc. ("Parsec" or
"Employer") at its location in Elwood, Illinois.

6.      Plaintiffs have, at all relevant times, been "participants" as that term is defined by
Section 3(7) of ERISA, 29 U.S.C. § 1002(7), of the NPWU Severance Plan and NPWU 401(k)
Plan (collectively referred to as "NPWU Retirement Plans" or "Retirement Plans"). The NPWU
Retirement Plans' offices are located in DuPage County, Illinois.  Plaintiffs are currently
represented by the International Brotherhood of Teamsters, Local Union No. 179 ("Teamsters
Local 179" or "Local 179") for purposes of collective bargaining with Plaintiffs' Employers.

7.     For a number of years and until August 2017, the National Production Workers Union, Local 707 ("NPWU" or "Union") represented Plaintiffs and the other employees in the Elwood Bargaining Unit for purposes of collective bargaining with Plaintiffs' Employer.

8.     Pursuant to successive collective bargaining agreements between Parsec and NPWU ("NPWU CBA"), Parsec made contributions on behalf of Elwood Bargaining Unit employees into the NPWU Severance Plan until 2012.

9.     In 2012, the Board of Trustees of the NPWU Severance Plan established the NPWU 401(k) Plan. Pursuant to the NPWU CBA, from 2012 through approximately August 2017, Parsec made contributions on behalf of the Elwood Bargaining Unit employees into the NPWU 401(k) Plan, and Parsec's contributions into the Severance Plan on behalf of Elwood Bargaining Unit employees ceased.

10.     The NPWU Severance Plan is a multiemployer defined contribution "money purchase" pension plan as that term is defined by ERISA, which maintains offices in DuPage County.

11.     The NPWU 401(k) Plan is a multiemployer defined contribution "profit sharing" pension plan as that term is defined by ERISA, which maintains offices in DuPage County.

12.     The Retirement Plans' assets, whether contributions to the Severance Plan or 401(k) Plan, are held in trust by the National Production Workers Union Severance Trust Fund.

13.     The NPWU Severance Plan provides for severance or  retirement benefits to be paid to qualified participants and their beneficiaries in the amounts and under conditions specified in the January 1, 1985 Restated Trust Agreement and Declaration of Trust ("Trust Agreement"), the Plan Document of the Severance Plan, the Summary Plan Description ("SPD"), and in accordance with applicable law.

14.     The NPWU 401(k) Plan provides for retirement benefits to be paid to qualified participants and their beneficiaries in the amounts and under conditions specified in the January 1, 1985 Restated Trust Agreement and Declaration of Trust (under which the 401(k) Plan assets are held), the 401(k) Plan Document, and in accordance with applicable law.

15.     Defendants Joseph Senese, Rosie Gibson, James Malloy, Scott Gore, and Jose Diaz, jointly and individually comprise the Defendant Board of Trustees of the Retirement Plans. Defendant Board of Trustees has, at all relevant times, been the Plan Administrator and Plan Sponsor of the Retirement Plans, as those terms are defined by ERISA, 29 U.S.C. §§ 1002(16)(A) and (B).  Defendant Board of Trustees is a fiduciary with respect to the Retirement Plans in its capacity as Plan Administrator, as a named fiduciary pursuant to 29 U.S.C. § 1102(a) and through powers exercised by the Board of Trustees pursuant to 29 U.S.C. § 1002(21)(A)(i).

16.     Defendant Joseph Vincent Senese is, on information and belief, an officer and/or employee of NPWU and a union-appointed trustee and fiduciary of the Retirement Plans charged with the duty to administer the Retirement Plans solely in the interests of Plan participants and in accordance with the governing plan documents, and all applicable laws.

17.     Defendant Rosie Gibson is, on information and belief, an officer and/or employee of NPWU and a union-appointed trustee and fiduciary of the Retirement Plans charged with the duty to administer the Retirement Plans solely in the interests of participants and in accordance with the terms of the plans and all applicable laws.

18.     Defendant Jose Diaz is, on information and belief, an officer and/or employee of NPWU and a union-appointed alternate trustee and fiduciary of the Retirement Plans charged with the duty to administer the Retirement Plans solely in the interests of participants and in accordance with the terms of the plans and all applicable laws.

4

19.    Defendants James Malloy and Scott Gore are employer trustees and fiduciaries of the Retirement Plans charged with the duty to administer the Retirement Plans solely in the interests of participants and in accordance with the terms of the plans and all applicable laws.

20.    Defendant James Meltreger is, on information and belief, an officer and/or employee of NPWU and the "Plan Manager" of the NPWU Retirement Plans, appointed by the Board of Trustees to act on its behalf in connection with day-to-day operations and administration of the Retirement Plans.  Defendant Meltreger is also referred to as the "Fund Director" in the Severance Plan's SPD.  On information and belief, Meltreger is a fiduciary of the Retirement Plans charged with the duty to administer the Retirement Plans solely in the interests of participants and in accordance with the terms of the plans and all applicable laws.

## FACTUAL BACKGROUND

### Collective Bargaining Agreements Covering the Parties

21.    Parsec made contributions to the Severance Plan on behalf of Elwood Bargaining Unit employees pursuant to the terms of the NPWU CBA until 2012.    Since 2012 and through about August 2017, the NPWU CBA provided for employer contributions on behalf of Elwood Bargaining Unit to be made into the NPWU 401(k) Plan instead of the NPWU Severance Plan.

22.    Plaintiffs' individual Severance Plan accounts containing contributions through 2012 remain in the Severance Plan.  Contributions by Parsec to the NPWU 401(k) Plan were deposited in the trust controlled by the Board of Trustees of the NPWU Severance Plan and allocated to individual accounts of the Elwood Bargaining Unit participants.

23.    A representation election was held on or around June 21, 2017 concerning representation of a unit of approximately 507 Parsec employees.  Teamsters Local 179 prevailed, receiving nearly 60% of all votes cast.  On or about July 12, 2017, the NLRB certified Teamsters

Local 179 as the exclusive bargaining representative for the Elwood Bargaining Unit, replacing NPWU. Soon thereafter, Teamsters Local 179 and Parsec entered into an interim collective bargaining agreement which, *inter alia*, provided for Parsec to begin making contributions to the Teamsters Supplemental Income Plan 401(k) Plan ("Teamsters 401(k) Plan").

24. Contributions into the NPWU 401(k) Plan on behalf of Elwood Bargaining Unit employees ceased in or about September 2017.

25. The union-appointed Trustees of the NPWU Retirement Plans ("Union Trustees") demanded that Parsec continue to make voluntary salary deductions from Elwood Bargaining Unit employees' paychecks and pay them to the NPWU 401(k) Plan after the Elwood Bargaining Unit decertified NPWU as its bargaining representative.

26. Teamsters Local 179 and Parsec agreed that there was no legal basis for that demand of the Trustees of the NPWU 401(k) Plan and rejected the demand to continue making contributions into the NPWU 401(k) Plan.

27. Parsec employees in California also decertified NPWU as their bargaining representative in 2017 in favor of Teamsters Local 986 in Los Angeles, California.

**Administration of the Retirement Plans**

28. The NPWU Retirement Plans are jointly administered through the Board of Trustees appointed by the National Production Workers Union and the incumbent Employer Trustees. Representation on the Retirement Plans' Board of Trustees is equally divided between the NPWU-appointed Trustees and the Employer Trustees; Article 3.1 of the Trust Agreement provides that two trustees are appointed by the NPWU and the other two are to be elected by "Employers." The NPWU has also appointed an alternate Union Trustee. Relevant excerpts of the Trust Agreement are attached as Exhibit A.

6

29. On information and belief, all of the union-appointed trustees of the NPWU Retirement Plans are officers and/or employees of NPWU.

30. The Trust Agreement does not identify the employers with authority to make employer appointments. The Trust Agreement provides that "[f]rom time to time the Employer Trustees shall call a meeting of all Employers for the purpose of electing the Employer Trustees" . . . . and that any successor "Employer Trustee shall be appointed by action of the Employers at a meeting called for such purpose." (Ex. A, Art. 3.1, 3.4.)

31. Upon information and belief, contributing employers never held meetings to elect Employer Trustee Defendants Malloy and Gore.

32. Consistent with the defined contribution structure of the NPWU Retirement Plans, all participants (including Plaintiffs) have their own individual accounts. The value of each participant's account in the NPWU Severance Plan is based solely on employer contributions made on the participant's behalf and net investment income allocated to the participant's account, less allocable portions of plan administration fees and any net investment losses. Each participant's right to receive benefits under either plan is fully vested immediately when she or he becomes a participant. The value of each participant's account in the NPWU 401(k) Plan is based on employer contributions made on the participant's behalf, plus any voluntary contributions the participant makes into the plan, and investment income or losses directly attributable to the participant's account, less allocable portions of plan administration fees.

**Plaintiffs' Administrative Claims for Transfer of Retirement Plan Benefits**

33. One of the major issues in the campaign to decertify the NPWU was the NPWU Retirement Plans. Many members of the Elwood Bargaining Unit, including Plaintiffs, were unhappy with both the representation by the NPWU and the management and performance of the

NPWU Retirement Plans. Plaintiffs and other members of the Elwood Bargaining Unit wanted to leave the NPWU Retirement Plans, become participants in the Teamsters 401(k) Plan, and transfer their existing NPWU Retirement Plan account balances into the Teamsters 401(k) Plan.

34. During the decertification campaign, NPWU explicitly threatened Elwood Bargaining Unit members by repeatedly telling them that, by voting for Teamsters Local 179, participants would lose complete control over their accounts. NPWU told Elwood Bargaining Unit members that their accounts would stay within the control of the NPWU and that the Elwood Bargaining Unit would not be permitted to withdraw their money or otherwise transfer their accounts to the Teamsters 401(k) Plan. Some of these threats specifically came from Defendant Senese, who is an officer of NPWU and a trustee of the NPWU Retirement Plans.

35. The Plan Documents of the Severance Plan and 401(k) Plan entitle participants to a distribution upon "Severance," death or attaining the age of 65. "Severance" is defined in both plans as separating from current employment or transferring to a nonunion position for the same employer. The Severance Plan expressly permits, and, on information and belief, has a practice of making, distributions or allowing rollovers to other retirement plans to employees who *leave* the NPWU, either through appointment to a non-union position or termination of employment, but not to employees who remain in union positions but exercise their rights under the NLRA to leave the NPWU, even though this is not expressly prohibited by the Plan Document.

36. The Plan Documents for the Retirement Plans do not expressly include or exclude a change in bargaining representative from their definitions of "Severance." Relevant excerpts of the Severance Plan Document and the 401(k) Plan Document are attached hereto as Exhibits B and C, respectively. Nevertheless, the SPD of the Severance Plan (relevant excerpts of which are attached as Exhibit D) expressly states that "a Severance <u>does not occur</u> if a Participant is

employed by a Contributing Employer that decertifies from the Union and the Participant remains employed with the employer." (Ex. D, p.5 (emphasis in original).) To Plaintiffs' knowledge, there is no SPD for the 401(k) Plan apart from the 401(k) Plan Document.

37.     The restrictive provision of the Severance Plan SPD quoted in the prior paragraph violates ERISA and the Internal Revenue Code ("Code") requirements for qualified plans, provides no benefit to participants, is not needed to protect the funded status of the plans, and embodies a discriminatory purpose inconsistent with employees' rights established as a matter of federal policy by the NLRA.

38.     Following Local 179's replacement of NPWU as exclusive representative for the Elwood Bargaining Unit, counsel for Local 179 and for Plaintiffs requested that the Trustees of the NPWU Retirement Plans either transfer all assets attributable to the individual accounts of Elwood Bargaining Unit employees to the Teamsters 401(k) Plan, or permit voluntary rollovers by individuals into the Teamsters 401(k) Plan. The Teamsters 401(k) Plan has confirmed that it can accept transfers or rollovers of participants' accounts in the NPWU Retirement Plans.

39.     Plaintiffs submitted formal claims for benefits on October 26, 2018 with the Trustees demanding that the Trustees adopt a rule or amendment allowing participants no longer represented by NPWU to rollover their accounts in the NPWU Retirement Plans to the retirement plan sponsored by Teamsters Local179 based on the interests of participants and in accordance with the requirements of ERISA,

40.     Following through on NPWU's threats, the Trustees of the NPWU Retirement Plans refused to act in the interests of and on the requests of the Elwood Bargaining Unit participants and adopt plan provisions that would permit such transfers.

41.     In December 2018, Plaintiffs discovered that the Retirement Plans' annual reports for the plan year ended December 31, 2017 disclosed the cessation of all contributions to the NPWU 401(k) Plan and a cessation of 75% of the contributions to the Severance Plan.

42.     Note 13 of the audit report attached to the Severance Plan's 2017 Form 5500 disclosed that: "two significant employers decertified from the related Union and ceased contributing to the Fund effective July 1, 2017 and December 1, 2017.  In 2017 these employers accounted for approximately 75% of the total contributions received during the year."  Relevant excerpts of the Severance Plan's Form 5500s for the years 2015 through 2017 are attached hereto as Group Exhibit E, Attachments 1 through 3, respectively.

43.     The 2017 401(k) Plan Form 5500 states that there was only one participating employer in 2017.  Relevant excerpts of the 2017 Form 5500 are attached as Exhibit F.

44.     Parsec was the only participating employer in the 401(k) Plan at the time that the Elwood Bargaining Unit employees decertified NPWU in June 2017.

45.     At the time that Parsec ceased contributing to the NPWU 401(k) Plan in 2017, all employer contributions to the NPWU 401(k) Plan temporarily or permanently ceased.

46.     In February 2019, following discovery of the annual reports for the plan year ended December 31, 2017, Plaintiffs supplemented their October 2018 claim filed with the Retirement Plans to demand that the Trustees terminate the 401(k) Plan and approve a partial termination of the Severance Plan.   At the time of submitting their supplemental claim in February 2019, the Trustees of the NPWU Plans had already failed to respond to the October 2018 claims within the time required by ERISA.  The Trustees also did not respond to the February 2019 supplemental claim. The Plaintiffs have deemed the claims to be denied.

47.     On information and belief, including information from annual reports of the NPWU Retirement Plans and reports of a prior U.S. Department of Labor investigation, the Trustees of the NPWU Retirement Plans (1) arbitrarily refuse to permit what would be lawful transfers or rollovers of participants' individual accounts to qualified retirement plans sponsored and managed by representatives of employers and unions with collective-bargaining agreements covering those participants; (2) refuse to terminate the 401(k) Plan and partially terminate the Severance Plan in violation of the Code and the Plan Documents; (3) fail to act in the interests of participants in locating and paying out benefits held for many participants who have an immediate right to their benefits; (4) pay excessive or unreasonable compensation to a Union Trustee and/or his family member and pay excessive or unreasonable compensation and benefits to other NPWU officers or employees with positions in the NPWU Retirement Plans; (5) pay excessive or unreasonable compensation to service providers; (7) have engaged in numerous prohibited transactions, including making unlawful loans of Severance Plan assets to an NPWU-sponsored Insurance Fund; and (7) retained the assets of participants no longer represented by NPWU in order to provide a larger pool of investment assets for the benefit other groups of participants still represented by NPWU; and (8) retained the assets of participants no longer represented by NPWU in order to generate larger investment returns to cover the excessive administrative expenses of the Retirement Plans.

48.     The participants in the Elwood Bargaining Unit exercised their right under the National Labor Relations Act to change bargaining representative, in significant part, for the purpose of terminating the authority of the NPWU officers to negotiate and control their vested retirement benefits. The refusal of the Trustees of the NPWU Retirement Plans to permit lawful transfers or rollovers of participants' account balances in the best interest of the Elwood

11

Bargaining Unit participants leaves such participants' vested retirement benefits subject to the unfettered control of NPWU-appointed fiduciaries, as well as employer fiduciaries whom cannot be appointed or removed by the employer of the Elwood Bargaining Unit employees.

### ERISA Fiduciary Duties

49.     The "principal object" of ERISA "is to protect plan participants and beneficiaries." *Boggs v. Boggs*, 520 U.S. 833, 845 (1997) (internal citation omitted).  The "crucible of congressional concern was misuse and mismanagement of plan assets by plan administrators" and "ERISA was designed to prevent these abuses." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 n.8 (1985) (citing legislative history).

50.     In furtherance of this purpose, Section 404 of ERISA imposes on fiduciaries the duties of loyalty and prudence.  29 U.S.C. § 1104(a)(1).

51.     The duty of loyalty requires that fiduciaries act "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A).  Fiduciaries must act "with an eye single to the interests of the participants and beneficiaries" and avoid being in a position where their positions as officers of a union or employer will "prevent their functioning with the complete loyalty to participants demanded of them as trustees . . . ." *Leigh v. Engle*, 727 F.2d 113, 125 (7th Cir. 1984) (internal citation omitted). "Where the potential for conflicts is substantial, it may be virtually impossible for fiduciaries to discharge their duties with an 'eye single' to the interests of the beneficiaries, and the fiduciaries may need to step aside, at least temporarily, from the management of assets where they face potentially conflicting interests." *Id.*

52.     The duty of prudence requires the fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like

capacity and familiar with such matters would use in the conduct of the enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

53.     ERISA supplements the fiduciary duties of loyalty and prudence set forth in Section 404 through Section 406's prohibition on transactions with "parties in interest" by "categorically barring certain transactions deemed 'likely to injure the pension plan.'" *Keach v. U.S. Trust Co.*, 419 F.3d 626, 635 (7th Cir. 2005) (quoting *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241-42 (2000)). Under Section 406, except as provided by Section 408 (which creates certain exemptions from prohibited transactions), fiduciaries are prohibited from engaging in a transaction if, *inter alia*, "he knows or should know that such transaction constitutes a direct or indirect:" lending of money or extension of credit to a party in interest; furnishing of goods or services to a party in interest; and transfer to, or use by or for the benefit of a party in interest, of any assets of the plan. 29 U.S.C. § 1106(a)(1)(B), (C), and (D).

54.     Section 406 also prohibits transactions between the plan and fiduciaries. Under 29 U.S.C. § 1106(b), the fiduciary shall not:

> (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

55.     Congressional intent of Section 406 "was to prevent fiduciaries from engaging in any conduct that might have the potential" to cause the fiduciaries to waver in their "undivided loyalty" to plan participants. *Chao v. Linder*, 2007 U.S. Dist. LEXIS 40425, *24 (N.D. Ill. May 31, 2007) (citing *Leigh*, 727 F.2d at 123)). "It is clear that Congress sought to prevent fiduciary breaches by prohibiting transactions between fiduciaries and parties of interest that exude even the appearance of impropriety and allow for the potential of abuse" because "it would be

psychologically unrealistic to expect a trustee to ignore his personal interests when they are potentially at odds with his fiduciary obligations." *Id*. at 24-25 (internal quotation omitted).

56.     Section 408 provides certain exemptions to prohibited transactions, such as receipt by a fiduciary of "reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan."  29 U.S.C. § 1108(c)(2).  However, "no person so serving who already receives full time pay . . . from an employee organization whose members are participants in such plan shall receive compensation from such plan, except for reimbursement of expenses properly and actually incurred." *Id.*

57.     Fiduciaries may be liable for the breaches of co-fiduciaries if they (1) knowingly participate in, or undertake to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) by a failure to exercise their fiduciaries duties, they enable the other fiduciary to commit a breach; or (3) if having knowledge of the breach of another fiduciary, he fails to make reasonable efforts to remedy the breach.  29 U.S.C. § 1105(a).

58.     Under Section 409, 29 U.S.C. § 1109(a), a fiduciary who breaches any of his fiduciary duties imposed on him by ERISA shall be "personally liable to make good to such plan any losses to the plan resulting from each such breach, and to have been made through the use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary."

**Fiduciary Breaches by Defendants**

<u>Failure to Transfer Benefits Following Decertification from NPWU</u>

59.     Defendant Trustees, in failing to terminate or partially terminate the Retirement Plans, and failing to permit a rollover of benefits, as requested by Plaintiffs, have violated their

14

fiduciary duty to operate and administer the NPWU Retirement Plans for the sole benefit of participants, including Plaintiffs.

60.     The settlors of the Trust in 1984 gave authority to the Trustees to adopt rules and regulations and construe the provisions of the Trust Agreement, "which rules, regulations and constructions shall be binding upon the Union, Employers, and Participants in the Plan and their beneficiaries." (Ex. A, Art. 5.2(q).) The Trustees were also invested with authority to amend the Trust provided that the amendment did not divert Trust assets for a "purpose other than the exclusive benefit of the Participants in the Plan and their beneficiaries." (*Id.* at Art. 6.1.) The terms of the Trust Agreement do not provide the Trustees with settlor authority to adopt rules or amendments for the purpose of benefiting the Union.

61.     The Retirement Plans restrictive terms requiring participants to keep their account balances in the control of NPWU Trustee after they decertified NPWU as their bargaining representative and after their employer ceased to be a contributing employer to the plans violate ERISA's duty of loyalty and the terms of the Plan Documents and Trust Agreements, which all require the Retirement Plans to use the assets for the exclusive benefit of the Participants.  The adoption of such a term violated ERISA from its inception, and the refusal of Defendant Trustees to take corrective action by amending the rules or Plan Documents to comply with ERISA and the governing documents constitutes an ongoing breach of their fiduciary duties.

62.     The restriction also violated the Code's requirements for qualified plans and applicable regulations, which require that participants of defined contribution plans be permitted to cash out or rollover their vested account balances after their employer terminates their plan or there ceases to be an employment relationship between the participant and the plan sponsor. When Plaintiffs and the other Elwood Bargaining Unit members decertified NPWU and Parsec,

their employer, withdrew from the Retirement Plans, it was effectively either a termination of the plan, a termination of the employment relationship, or both, and Plaintiffs became entitled to a distribution of their vested benefits.

63.     Defendant Trustees have authority to amend the plan terms and have decided to maintain the terms barring the transfer of Plaintiffs' accounts to the Teamsters 401(k) Plan.

64.     The Trustees of the NPWU Retirement Plans refuse to amend the plans because of a conflict of interest. Defendant Trustees neither represent the interests of the Plaintiffs in collective-bargaining nor employ Plaintiffs. Refusing to allow the lawful transfers of Plaintiffs' accounts to the Teamsters 401(k) Plan in which Plaintiffs and their employer, Parsec, are now actively participating and contributing does not benefit Plaintiffs but benefits the participants still represented by NPWU who can spread the cost of administrative expenses over a higher number of accounts, as well as the officers and employees of NPWU who continue to receive compensation or cause family members to receive compensation from the Retirement Plans at the expense of participants' accounts.

65.     Plaintiffs are subject to and are now incurring duplicative administrative expenses in maintaining separate accounts in both the NPWU Retirement Plans and the Teamsters 401(k) Plan, the latter of which has substantially lower administrative fees.

66.     On information and belief, the expenses of the NPWU Retirement Plans include, but are not limited to, the expenses of plan administrator, plan manager, investment manager, actuary, accountant, attorneys, fiduciary liability insurance policy, fidelity bond, office rent, stationary, printing, consulting fees, and compensation to Retirement Plan employees who are also officers and/or employees of NPWU or are family members of such individuals. Each participant bears her or his *pro rata* share of these administrative expenses.

16

67.     These duplicative administrative expenses are eroding the retirement benefits that were contributed on Plaintiffs' behalf by Parsec to be held in trust for their benefit.

68.     If Defendants are compelled to transfer Plaintiffs' account balances to the Teamsters 401(k) Plan – a plan Plaintiffs and other Parsec employees have now chosen through collective bargaining with Local 179, Plaintiffs' share of administrative costs will be reduced and the potential for growth of their retirement benefits will increase.  The asset base of the Teamsters 401(k) Plan will increase, which in turn, may enable the Teamsters 401(k) Plan to reduce the percentage of administrative fees allocable to Plaintiffs.  Furthermore, Plaintiffs will be given more control over the management and growth of their retirement benefits.

69.     The Defendant Trustees, acting with a conflict of interest, have admitted that one of the reasons for refusing to adopt the requested plan amendments is their desire to reduce the administrative costs of the NPWU-represented participants still in the Severance Plan by requiring the Plaintiffs and similarly situated participants to remain in the NPWU Retirement Plans and share the cost of administrative expenses, in breach of their fiduciary duties.

70.     Defendant Trustees have further breached their fiduciary duties, as well as ERISA's anti-discrimination provisions, by discriminating against participants for engaging in union activities protected by the National Labor Relations Act ("NLRA").  The Severance Plan expressly permits, and, on information and belief, has a practice of making distributions or allowing rollovers to other retirement plans to employees who *leave* the NPWU, either through appointment to a non-union position or termination of employment, but not to employees who remain in union positions but exercise their rights under the NLRA to leave the NPWU, even though this is not expressly prohibited by the Plan Document.

71.     Defendants' refusal to transfer Plaintiffs' account balances to the Teamsters 401(k) Plan following their selection of a new bargaining representative is arbitrary, unreasonable, and capricious, especially in light of the Severance Plan's authorization of account transfers when participants leave the union for any reason other than decertification and/or joining another union. The restriction is intended to serve as a negative consequence for employees who exercise their rights to elect a bargaining representative other than NPWU.

72.     The conduct of NPWU during the representation election campaign has irreparably impaired Defendant Trustees' ability to carry out their fiduciary duties of loyalty and prudence to Plaintiffs.  NPWU strenuously opposed Local 179's organizing campaign and threatened Plaintiffs with a loss of any influence or control over their individual retirement accounts if they left NPWU for Local 179 because the Retirement Plans would refuse to transfer the Elwood Bargaining Unit's accounts into the Teamsters 401(k) Plan.  The Trustees appointed by NPWU comprise half of the Retirement Plans' Board of Trustees, and, on information and belief, all of them are officers and/or employees of NPWU.  Plaintiffs' rejection of NPWU following an acrimonious campaign that included threats by NPWU not to transfer account balances (including explicit threats by individuals who are plan fiduciaries) made it impossible for Defendants Senese, Gibson, and Diaz to carry out their fiduciary duties of loyalty and prudence to Plaintiffs in making a decision on Plaintiffs' claims without a conflict of interest.

73.     Requiring Plaintiffs to keep their pension benefits in plans jointly managed by appointees of the NPWU, the union they affirmatively rejected with their choice of Local 179 as their exclusive bargaining representative, negatively affects Plaintiffs' ability to protect their interests as participants.  The desire of Plaintiffs and other Elwood Bargaining Unit employees to switch their accounts from the custody of the NPWU Retirement Plans, with which they were

very dissatisfied, to the Teamsters 401(k) Plan, was a key factor motivating many employees in the Elwood Bargaining Unit to replace NPWU with Teamsters Local 179. Defendant Trustees had a fiduciary duty to honor Plaintiffs' clearly expressed and permissible requests in this regard.

74.     Defendants Senese, Gibson, and Diaz had an obligation to at least recuse themselves from any decision as to whether the Retirement Plans would adopt provisions allowing the transfer of Plaintiffs' accounts to the Teamsters 401(k) Plan. As NPWU officers, they had an interest in protecting the interests of participants represented by NPWU and protecting their positions within NPWU by requiring that participants in the Elwood Bargaining Unit keep their account balances in the control of and for the benefit of the Retirement Plans.

75.     Defendants' refusal to allow for the transfer of Plaintiffs' account balances to the Teamsters 401(k) Plan is inconsistent with policies embodied within ERISA and the requirements of the Code favoring the portability of employee retirement accounts, including but not limited to 29 U.S.C. § 1415, which mandates, in the case of defined benefit plans, the transfer of plan assets to participants' new plan following a certified change in collective bargaining representative, and 26 U.S.C. §§ 401(a)(14)(c), 401(k)(10), and 411(d)(3), which collectively mandate, in the case of defined contributions plans, a distribution of benefits upon termination of the plan or termination of the employment relationship with the plan sponsor. Defendants' rejection of these policies in order to benefit the NPWU and its members is inconsistent with the prudent practices of like fiduciaries of employee benefit plans.

<u>Department of Labor Complaint</u>

76.     The Retirement Plans have a history of engaging in prohibited transactions and other unlawful actions, the effects of which still have not been corrected, causing Plaintiffs to question whether Defendant Trustees and Defendant Meltreger are capable of loyally and

prudently managing Plaintiffs' retirement assets. These prohibited transactions and unlawful actions include, but are not limited to, the following:

a. In 2008, the Severance Plan engaged in a prohibited transaction when its related National Production Workers Union Insurance Trust Fund ("Insurance Fund") – which, on information and belief, is a multi-employer welfare fund as defined by ERISA – profited from a deposit error of $189,579 of Severance Plan employer contributions. According to the Severance Plan's Form 5500 for the year 2016, a balance of $139,579 was still owed by the Insurance Fund to the Severance Plan. The failure of the Trustees to require the Insurance Fund to make full repayment on the amount has caused a loss of account allocation and investment income to participants. Such failure reflects fiduciary breaches by the Trustees resulting from a willingness to protect a separate NPWU-sponsored benefit plan at the expense of the participants in the NPWU Severance Plan. Plaintiffs seek the right to transfer their account balances to the Teamsters 401(k) Plan to avoid the effects of such conflicts created by the NPWU affiliation of the Defendant Union Trustees and Defendant Meltreger.

b. Since 2009, the Severance Plan has approved and made over $400,000 in loans to the Insurance Fund in violation of the Defendants' fiduciary duties. These prohibited transactions, which are noted as prohibited transactions in the Severance Plan's 2016 Form 5500, impermissibly redirected money from the Severance Plan and may have reduced investment gains that otherwise would be allocated to Plaintiffs' accounts.

c. In or about January 2016, the United States Department of Labor ("DOL") filed suit against the Severance Plan and its then-Plan Manager Anthony Monaco for breach of fiduciary duty in this District Court. The DOL Complaint alleged that the Severance

Plan had improperly used Plan assets to pay expenses of the Insurance Fund; failed to make distributions to over 10,000 participants who had left the Severance Plan and who were collectively owed over $13.5 million in distributions; and improperly used plan assets for purposes that were not related to reasonable plan expenses or for the benefit of participants. On or about January 22, 2016, a Consent Order and Judgment was entered in which, *inter alia*, Monaco expressly admitted all of the allegations in the Complaint; Monaco resigned as Plan Manager; and all losses associated with the violations alleged in the Complaint were to be repaid to the Severance Plan. *See Perez v. Monaco et al.*, Case No. 16-CV-597 (2016).

d. The Severance Plan's Form 5500s for 2016 and 2017 reveal that the Severance Plan made little to no progress in making payments to the more than 10,000 participants identified by the DOL as being owed over $13.5 million in benefits.

77. Defendants have also engaged in a variety of other fiduciary breaches, in addition to those identified by the DOL and in Form 5500s, including but not limited to self-dealing and failing to administer the plan for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses, which are more fully set forth below:

<u>Unsubstantiated and Excessive Expenses</u>

78. The 2015 Form 5500 for the Severance Plan states that the plan received $2,495,478 in employer contributions and paid $855,398 in administrative expenses in 2015. (Ex. E-1, Sched. H, Part II.) The total number of participants with account balances is identified as 12,591, of which 2,195 were listed as active by the end of the year. (Ex. E-1, p.2, Line 6(b).) The total number of retired or separated participants identified as receiving benefits in the plan year is listed as zero. (*Id.*) Yet, Schedule R states that 207 participants received a single-sum

distribution, and the Schedule H states the total amount of payments made to participants and beneficiaries was $1,928,215.  (Ex. E-1, Sched. R, Part I; Sched. H, Part II.)

79.     The 2016 Form 5500 for the Severance Plan states that the plan received $2,723,395 in employer contributions and paid $871,252 in administrative expenses in 2016. (Ex. E-2, Sched. H, Part II.)  The number of "participants with account balances as of the end of the plan year" in the Severance Plan changed from 12,591 in 2015 to 11,153 in 2016, yet nowhere in the Form 5500s is there evidence that 1,438 participants received distributions in 2016.  Instead, the Form 5500 for 2016 shows that, at most, 343 individuals received distributions. (Ex. E-2, Sched. R).  However, elsewhere in the same Form 5500, the total number of retired or separated participants identified as receiving benefits in the plan year is listed as zero (Ex. E-2, p.2, Line 6(b)), while the total amount of payments made to participants or beneficiaries in the plan year is listed as $2,499,028. (Ex. E-2, Sched. H, Part II.)

80.     It is unclear whether the Severance Plan fiduciaries were still incapable of filing accurate reports for the plan years ended December 31, 2015 and 2016, or whether the payments made to participants or beneficiaries consisted of something other than plan benefits since there were no retired or separated participants or beneficiaries identified as receiving benefits in the plan years and the plan is designed to provide severance benefits.

81.     The 2017 Form 5500 for the Severance Plan states that the plan received $1,519,862 in employer contributions and paid $838,150 in administrative expenses in 2017. (Ex. E-3, Sched. H, Part II.)  The total number of "participants with account balances as of the end of the plan year" changed from 11,153 in 2016 to 12,656 in 2017, despite the fact that the number of active participants dropped from 3511 in 2016 to 689 in 2017.  (Ex. E-3, p.2.) Additionally, the Form 5500 for 2017 indicates that, again, no retired or separated participants

22

received benefits during the year. (*Id.*) Elsewhere on the Form 5500, Schedule H shows that $2,230,389 was paid directly to participants. (Ex. E-3, Sched. H, Part II.)

82. It is unclear whether the Severance Plan fiduciaries were *still* incapable of filing accurate reports for the plan year ended December 31, 2017, or whether the payments made to participants and beneficiaries were made as something other than plan benefits since there were no retired or separated participants or beneficiaries identified as receiving benefits.

83. The Form 5500s for 2015 through 2017 reveal that the Severance Plan's ratio of total administrative expenses to total expenses was approximately 30.7% in 2015, 25.9% in 2016, and 27.3% in 2017. (Ex. E-1, E-2, and E-3, Sched. H, Part II, Lines i(5) and j.)

84. According to an independent 2018 report analyzing the 2016 Form 5500s of 705 multiemployer welfare plans across the country, the median ratio of administrative expenses to total plan expenses for plans with fewer than 500 members was 7.5%, with that ratio *decreasing* as the plan size increases. Milliman Research Report[1] at p.11, ("Milliman Report"). On average, multiemployer plans spent 5.8% of total expenses on administrative expenses, with only 39 spending more than 15% and 230 spending less than 5%. (*Id.* at p.2.) The ratio of administrative expenses to total expenses "is an indicator of how much of the total expense budget is spent on things that directly benefit the members." (*Id.* at p.9.)

85. The Severance Plan's ratio of administrative expenses far exceeds the national median for multiemployer welfare plans.

86. The Milliman Report focused on multiemployer welfare plans and Plaintiffs have not found a similar study for multiemployer pension plans. But based on the Form 5500s of the Severance Plan for 2015 through 2017 reporting that no retired or separated participants received

---

[1]*Available at* http://us.milliman.com/uploadedFiles/insight/2018/status-collectively-bargained-benefits.pdf. Last accessed April 18, 2019.

benefits, there is no apparent need for full time administration of the plan, as there typically would be for a welfare plan, and no apparent reason for such a high ratio of administrative expenses to total plan expenses. Furthermore, the NPWU's multiemployer welfare plan, the Insurance Fund, which on information and belief is run by the same board of trustees, had a ratio of administrative expenses to total expenses of 40.4% in 2016 and 40.2% in 2017, suggesting that Defendants operate their benefit plans at unreasonable expense to the participants.

87.     For comparison to a multiemployer pension plan, the Teamsters 401(k) Plan, into which Plaintiffs wish to rollover their benefits, had a ratio of 1% administrative expenses to total plan expenses in 2016 and 2017, according to its Form 5500 for those respective years.

88.     Plaintiffs requested but did not receive any documents from Defendants that would substantiate the information reported on the Retirement Plans' Form 5500s.  The lack of transparency in the Retirement Plans' finances violates Defendants' duty of loyalty as fiduciaries and their reporting and disclosure obligations as administrator of the plan.  The amounts reported on the Severance Plan's Form 5500s for 2015 through 2017 do not make sense without additional context and are cause for concern about the administration of the Retirement Plans. The participants are entitled to a full accounting of the Retirement Plans' finances.

  Unreasonable and/or Prohibited Compensation, Self-Dealing and False Reporting

89.     The 2015 through 2017 Form 5500s for the Retirement Plans indicate that Defendants breached their fiduciary duties by paying unreasonable compensation to service providers, to Defendant Meltreger, and to Defendant Senese or his family member.

90.     Schedule C of the Form 5500 requires that employee benefit plans identify who received direct or indirect compensation from the plan and identify the "[r]elationship to employer, employee organization, or person known to be a party-in-interest."  A "party-in-

24

interest" to an employee benefit plan is defined under ERISA, as, *inter alia*, "(A) any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such employee benefit plan; . . . (D) an employee organization any of those members are covered by such plan; . . . (F) a relative . . . of any individual described in subparagraph (A) . . .; [and] (H) an employee, officer, director (or an individual having powers or responsibilities similar to those of officers or director) . . . of a person described in subparagraph [D] . . ., or of the employee benefit plan." 29 U.S.C. § 1002(14).

91.     According to the 2015-2017 Form 5500s for the Severance Plan, Vincent Senese, Juan Fernandez Jr., Jeffrey Pierucci, and Mary Murphy are all listed as having no relationship to an employee organization or party in interest.  (Exs. E-1, E-2, and E-3 at Sched. C.)

92.     A comparison of the Severance Plan's Form 5500s to the NPWU's public financial disclosures reveals that answers provided in the Form 5500s are false, as all of the individuals listed in the above paragraph are listed as employees and/or officers of NPWU or are a relative of a Retirement Plan fiduciary.

93.     The following chart demonstrates some but not all of the persons or service providers who received payments from one or more NPWU entity according to the 2016 Form 5500 for the Severance Plan, the 401(k) Plan, and the Insurance Fund, as well as the 2016 LM-2 and LM-3 Forms filed by various NPWU-affiliated unions (identified as "Unions[2]" in the chart):

---

[2] The amounts under the "Unions" column in Paragraphs 93 and 96 are the sum of the amounts identified in the 2016 and 2017 LM-2 and LM-3 filings for the National Production Workers Union Ind. Local Union 707 Chicago and Vicinity (File No. 001-794); National Production Workers Union Ind. Local Union 707 Technical & Clerical Employees (File No. 516-328); National Production Workers Union Ind. Local Union 707 Truck Drivers Chauffeurs Warehousemen (File No. 517-818); National Production Workers Union Ind. Local Union 707 Cleveland and Vicinity (File No. 512-579); and National Production Workers Union Ind. Headquarters (File No. 000-344) (collectively, "NPWU-affiliated Unions"), all of which use the same address as the Retirement Plans and largely overlap in employees.

| | Severance Plan | 401 (K) Plan | Insurance Fund | Unions |
|---|---|---|---|---|
| Joseph V. Senese, Joseph V. Senese Jr. or Vincent Senese | $88,221 | - | $18,538 | $539,771 |
| James Meltreger | $96,008 | - | $49,605 | $0 |
| Juan Fernandez Jr. | $37,290 | - | $9,322 | $41,225 |
| Tammy Heinrichs | $31,026 | - | $10,342 | $9,000 |
| Mary Murphy | $16,936 | - | $8,468 | $16,936 |
| Jeffrey Pierucci | $12,512 | - | $3,128 | $97,506 |
| Jeffrey W. Krol & Associates | $181,605 | $18,500 | $130,463 | $25,000 |
| Thomas Paravola | $46,192 | - | $28,765 | - |
| FGMK, LLC | $37,450 | $17,181 | $16,287 | - |

94.     As demonstrated in the chart above, in 2016, Defendant Senese or his relative received compensation of $88,221 from the Severance Plan, $18,538 from the Insurance Fund, and upon information and belief, as much as $539,771[3] from NPWU-affiliated Unions as either the President, Vice-President, Executive Director, Recording Secretary, and/or Business Agent. ERISA prohibits plans from paying salaries of trustees who receive full-time pay from the employee organization whose members are participants in such plan and prohibits fiduciaries from causing a plan to make payments to relatives.

95.     As demonstrated in the chart above, in 2016, Defendant Meltreger received compensation of $96,008 from the Severance Plan and $49,605 from the Insurance Fund.  He received no compensation from NPWU but is identified as a President on one of NPWU's 2016 LM-2 filings.   To the extent that Defendant Meltreger provides services to one of the NPWU-affiliated Unions as its president, it appears based on the public filings that he is paid by the NPWU benefit funds for such services as there appears to be no allocation of his time and

---

[3] There are individuals identified as "Joseph Senese," "Joseph V. Senese," and "Joseph Senese Jr." and "Joseph V. Senese Jr." in 2016 and 2017 LM-2 and LM-3 filings for the NPWU-affiliated Unions.  It is impossible to determine if the individuals are distinct from one another, and which amounts are attributable to Defendant Senese versus a different Joseph Senese.

compensation among the organizations that he serves. Payment to Defendant Meltreger by the benefit funds, to the extent he provide services as President of one of the NPWU-affiliated Unions, is an unlawful party-in-interest transaction.

96.     The following chart demonstrates some but not all of the persons or service providers who received compensation from one or more NPWU entity according to the 2017 Form 5500 for the NPWU Severance Plan, the NPWU 401(k) Plan, and the NPWU Insurance Fund, as well as the 2017 LM-2 or LM-3 Forms filed by NPWU-affiliated Unions:

|  | **Severance Plan** | **401 (K) Plan** | **Insurance Fund** | **Unions** |
| --- | --- | --- | --- | --- |
| Joseph V. Senese, Joseph V. Senese Jr. or Vincent Senese | $83,774 | - | $15,975 | $175,904 |
| James Meltreger | $94,695 | - | $47,278 | $0 |
| Juan Fernandez Jr. | $1,014 | - | $745 | $1,750 |
| Tammy Heinrichs | $28,661 | - | $9,220 | $9,000 |
| Mary Murphy | $16,936 | - | $7,762 |  |
| Jeffrey Pierucci | $41,708 | - | $11,470 | $126,728 |
| Jeffrey W. Krol & Associates | $184,313 | $25,697 | $41,560 | $15,000 |
| Thomas Paravola | $33,008 | $17,123 | $11,385 | - |
| FGMK, LLC | $37,397 | $17,492 | $15,137 | - |
| Santina Consulting, LLC |  |  |  | $367,882[4] |

97.     As demonstrated in the chart above (and based on the publicly available Form 5500s, LM-2s, and LM-3s), in 2017, Defendant Senese or a family member received compensation of $83,774 from the Severance Plan, $15,975 from the Insurance Fund, and upon information and belief, as much as $175,904 from the NPWU-affiliated Unions as either the President, Vice-President, Executive Director, Recording Secretary, and/or Business Agent, plus up to an additional $367,882 through payments to Santina Consulting, LLC.

---

[4] Santina Consulting, LLC is a limited liability company that registered to do business in Illinois in February 2017.  Through at least the date of the filing of this complaint, the sole registered member of Santina Consulting, LLC has been Joseph V. Senese.

98.     As demonstrated in the chart above, in 2017, Defendant Meltreger received compensation of $94,695 from the Severance Plan and $47,278 from the Insurance Fund.  He received no compensation from the NPWU-affiliated Unions but is identified as the President on one of the 2017 LM-2 filings.

99.     Therefore, upon information and belief, Defendants are causing the Severance Plan to pay compensation of full-time or part-time NPWU-affiliated officers and/or to relatives of fiduciaries and are failing to disclose party-in-interest transactions.  Defendants Senese and Meltreger are engaging in self-dealing, and the remaining Defendants are breaching their fiduciary duties by allowing the Retirement Plans to engage in the prohibited transactions.

100.     Defendants Senese and Meltreger made false reports on their annual Form 5500s by concealing their affiliation with the NPWU, the NPWU affiliation of several others individuals receiving compensation from the Severance Plan, and/or the relationship of a relative who is receiving compensation from the Plan.  This concealment violates ERISA reporting and disclosure requirements, and based on the annual occurrence of the false reporting between at least 2009 through 2017, the concealment was intentional.

101.     As demonstrated in the charts above, Jeffrey W. Krol & Associates ("Krol & Associates"), received $181,605 in 2016 and $184,313 in 2017 from the Severance Plan.  Krol & Associates is a service provider that is identified as performing accounting and general consulting services for the Severance Plan based on the codes in Schedule C of the Form 5500s,.  FGMK, LLC is also identified as performing accounting services for the Severance Plan, including preparing the audit report attached to the Form 5500 for 2017.  FGMK, LLC received a payment of $37,450 for that service.

102.     The fees paid to Krol & Associates appear to be excessive.  The work performed by FGMK, LLC in preparing the audit report should have required far more work than preparation of the Form 5500 – the only apparent work that Krol & Associates performed.

103.     Krol & Associates represents itself as Certified Public Accountants & Consultants providing a "wide range of services to individuals and businesses in a variety of industries" according to its website.  Krol & Associates does not claim on its website to have any expertise concerning multiemployer benefit funds, unlike FGMK, LLC.

104.     Upon information and belief, unlike other service providers, no representative of Krol & Associates attended quarterly Board of Trustees meetings.

105.     Upon information and belief, the Board of Trustees was not provided regular reports of any consulting and/or accounting work performed by Krol & Associates.

106.     In 2017, Krol & Associates also received $25,697 from the NPWU 401(k) Plan, $41,560 from the NPWU Insurance Fund, and $15,000 from the NPWU-affiliated Unions, for a combined total of $266,570 from various parties in interest in 2017.  In 2016, Krol & Associates also received $18,500 from the NPWU 401(k) Plan, $130,463 from the NPWU Insurance Fund, and $25,000 from the NPWU-affiliated Unions, for a combined total of $355,568 from various parties in interest in 2016.

107.     On information and belief, the allocation of expenses paid to Krol & Associates between the different parties in interest was not reviewed by an independent accountant to determine what services were provided and whether the fees were reasonable and were properly allocated among the parties in interest.

108.     Upon information and belief, there are multiple accounting firms in the Chicago area that specialize in multiemployer benefit plan work to a greater degree than Krol &

Associates, that provide accounting services to larger plans than the Severance Plan, and that charge substantially lower fees than the fees paid to Krol & Associates by the Severance Plan.

109.    Plaintiffs and other participants are entitled to an accounting of the work performed by Krol & Associates and are entitled to documentation relating to the selection process that the Board of Trustees engaged in leading to the hiring of Krol & Associates to determine the extent to which the Board of Trustees breached their fiduciary duties in the hiring of and payment to Krol & Associates.

<u>Lack of Transparency in Method of Investment Allocation</u>

110.    29 U.S.C. § 1025(a)(1)(A)(ii) requires Defendant Board of Trustees and Defendant Meltreger to provide annual pension benefit statements to all participants. The pension benefit statements must contain the information described in 29 U.S.C. § 1025(a)(2)(A) and (B). Within at least the four (4) years prior to the filing of this lawsuit, Defendant Board of Trustees and Defendant Meltreger have not provided Plaintiffs with annual pension benefit statements that meet all of the requirements of 29 U.S.C. §§ 1025(a)(1)(A)(ii) and (a)(2).

111.    Since at least 2015, the benefit statement sent to Plaintiffs and Class has not been written in a manner calculated to be understood by the average participant and has not included information about the value of investments in which participants' accounts are allocated.

112.    The pension benefit statements provided by the Severance Plan to participants since 2015 state: "ACCOUNTS ARE VALUED QUARTERLY FOR INVESTMENT RETURN NET OF PLAN EXPENSES. THE NET INVESTMENT RETURN IS APPLIED TO YOUR ACCOUNT ON A PRO-RATED BASIS BASED ON THE AMOUNT OF TIME YOUR MONEY WAS IN YOUR ACCOUNT."

113.    The quoted portion in the above paragraph is vague and ambiguous.  One reasonable interpretation is that a participant's pro-rata share of the investment return is not tied to the actual amount in the participant's account during each day of the year, but based on how long the participant has had an account balance.

114.    This allocation method is alarming to Plaintiffs given the number of accounts the DOL identified as being owed benefit payments (over 10,000).  If those 10,000 accounts have all been in existence prior to Plaintiffs' participation in the Severance Plan, then those 10,000 accounts will receive a larger pro-rata share, even if the total contributions to their accounts were less than Plaintiffs.  Plaintiffs demand more transparency with respect to the Severance Plan's method of investment allocation to determine whether it is prudent and what the impact is on Plaintiffs' accounts when the Severance Plan fails to timely pay plan benefits to individuals. Defendants have refused to provide Plaintiffs with information requested to determine the reasonableness of the Severance Plan's investment allocation method.

## Exhaustion of Administrative Remedies

115.    On June 29, 2018, Plaintiffs and Local 179 made a demand on the Board of Trustees to allow the transfer of accounts belonging to Plaintiffs and the other individuals in the Elwood Bargaining Unit to the Teamster 401(k) Plan or to allow them to rollover their accounts into either the Teamsters 401(k) Plan or into a qualified account of the individual's choosing.

116.    Plaintiffs requested the Retirement Plans respond no later than July 30, 2018, and advise whether there was any administrative appeal process available to the participants. Defendants' counsel responded on or about July 31, 2018, and informed Plaintiffs that the Retirement Plans would not partition or transfer any of the accounts or make any amendments as may be necessary to allow for such a transfer.

117.    Plaintiffs submitted a letter to Defendants' counsel on August 15, 2018 responding to questions posed by Defendants and asserting their belief that the Retirement Plans' internal review and appeals procedures do not apply to Plaintiffs' claims for plan amendments, nor would they apply to claims for breaches of fiduciary duty against fiduciaries of the plans.

118.    Counsel for the Retirement Plans sent a letter to counsel for Plaintiffs dated August 25, 2018, disputing Plaintiffs' assertion that it would be futile to file claims for benefits and exhaust their administrative remedies.  This position taken by Defendants conflicts with the prior written positions taken by Defendants.

119.    In a good faith effort to comply with the purported administrative procedures, which Defendants claimed would not be futile, Plaintiffs Dean and Wollenzien submitted claims for benefits to the Retirement Plans on October 26, 2018, requesting that the Retirement Plans authorize a distribution of their benefits, and requesting information supporting the information reported on the Retirement Plans' Form 5500s.  Plaintiffs also requested additional documents related to their claims, including but not limited to their latest statement of benefits, internal memoranda and policies concerning the restrictive provision of the plans, and, if the claims were denied, information about which trustees participated in the decision to deny Plaintiffs' claims.

120.    The Retirement Plans did not respond to Plaintiffs' claim for benefits within ninety days, as required by ERISA and the plan documents, and have not responded as of the date of the filing of this complaint.

121.    Plaintiffs have exhausted their administrative remedies and the claims are deemed denied pursuant to 29 C.F.R. § 2560.503-1(l)(1).

122.    After sending their claims for benefits on October 26, 2018, Plaintiffs discovered that the Retirement Plans filed their 2017 Form 5500s in October 2018, revealing that the

withdrawal of Parsec from the Severance Plan in 2017 should have caused the Severance Plan to terminate with respect to Plaintiffs under 26 U.S.C. § 411(d)(3) and 26 C.F.R. § 1.413-1(c)(3) and the withdrawal of Parsec from the 401(k) Plan in 2017 should have caused the 401(k) Plan to terminate completely under the terms of the Plan Document, or in the alternative, at least with respect to Plaintiffs under 26 U.S.C. § 411(d)(3) and 26 C.F.R. § 1.413-1(c)(3).

123.     Plaintiffs sent the Severance Plan a letter dated February 14, 2019, requesting that the Severance Plan and 401(k) Plan make a determination that the plans had terminated with respect to Plaintiffs and other similarly situated Parsec employees.

124.     Defendants did not respond to Plaintiffs by March 7, 2019, as requested, and as of the date of the filing of this Complaint, Defendants have still not responded.

125.     The letter from Defendants' counsel dated July 31, 2018 made it clear that the Board of Trustees has firmly rejected a request that plan amendments be made, and makes it clear that further efforts to proceed through any administrative procedures would be futile.

126.     To fulfill their fiduciary duties and other legal obligations under ERISA, Defendants must terminate the Retirement Plans with respect to Plaintiffs and/or adopt plan amendments either to effectuate a transfer of Plaintiffs' Retirement Plan accounts to the Teamsters 401(k) Plan or allow participants to make rollovers qualified plans. The Teamsters 401(k) Plan is willing to accept these transfers. In addition, Defendants must restore to the Retirement Plans, and to Plaintiffs and Class members, all losses of the Plans from the fiduciary breaches described above, and allocate the recovered amounts to the accounts of the participants.

127.     Defendants must also be removed as fiduciaries and prohibited from ever serving as a fiduciary of any ERISA-governed plan.

128. Plaintiffs have served a copy of this complaint on the Offices of the Secretary of Labor and the Secretary of Treasury pursuant to 29 U.S.C. § 1132(h).

## CLASS ACTION ALLEGATIONS

129. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of a plan to bring an action individually on behalf of the plan to seek remedies provided by 29 U.S.C. § 1109(a). In addition, 29 U.S.C. § 1132(a)(3) authorizes any participant or beneficiary to bring suit for injunctive or other equitable relief. 29 U.S.C. § 1132(a)(1)(A) and (B) authorize a participant to bring a suit to redress an administrator's refusal to supply requested information and to recover benefits due to him under the terms of his plan, enforce his rights under the terms of the plan, or clarify his rights to future benefits under the terms of the plan. Plaintiffs seek certification of this action as a class action pursuant to these statutory provisions and Fed. R. Civ. P. 23.

130. Plaintiffs assert their claims against Defendants on behalf of a class of participants and beneficiaries of the Retirement Plans defined[5] as follows:

> All participants and beneficiaries of the National Production Workers Union Severance Trust Plan or of the National Production Workers Union 401(k) Retirement Plan who have accounts in either plan resulting from contributions made by Parsec, Inc. on their behalf for work performed in the Elwood Bargaining Unit.

131. <u>Numerosity</u>: The Class is so numerous that joinder of all Class members is impracticable. The Class consists of approximately 140 participants or beneficiaries who are active, plus an unknown amount of participants or beneficiaries who have severed employment from Parsec, Inc. and whose accounts remain in the Retirement Plans or whose accounts were reduced as a result of the unreasonable expenses and other prohibited transactions of Defendants.

---

[5] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

132. <u>Typicality</u>:  Plaintiffs' claims are typical of Class members' claims.  Like other Class members, Plaintiffs participated and have an account in the Retirement Plans, were employed by the same employer in the same bargaining unit, and suffered injuries as a result of Defendants' mismanagement of one or both of the Retirement Plans.

133. <u>Adequacy</u>:  Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in employee benefit class action litigation, including ERISA litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

134. <u>Commonality</u>: Common questions of law and fact exist as to all Class members and predominate over questions solely affecting individuals, including but not limited to:

a.  Whether Defendants are fiduciaries of the Retirement Plans;

b.  Whether the Retirement Plans' fiduciaries breached their fiduciary responsibilities under 29 U.S.C. § 1104 by engaging in the conduct described herein;

c.  Whether Defendants are additionally or alternatively liable as co-fiduciaries for the unlawful conduct described herein under 29 U.S.C. § 1105;

d.  Whether Defendants engaged in prohibited transactions that caused losses to the Plans and, therefore, injuries to participants of the Plans;

e.  Whether Defendants have violated their fiduciary responsibilities by adopting and maintaining Plan terms that are contrary to the interests of participants in bargaining units no longer represented by the NPWU but that benefit NPWU-represented bargaining units, the union and the persons administering or servicing the Plans;

f.  Whether it is in the best interests of participants to have Plan provisions providing for their accounts in Retirement Plans to be transferred the Teamsters  401(k) Plan or individually rolled over into another qualified account of their choosing;

g.  Whether Defendants' refusal to amend the Plans discriminated against Class members for exercising their collective bargaining rights;

h. Whether Defendants failed to terminate the Retirement Plans and distribute benefits to the Class under 26 U.S.C. § 411(d)(3) and under the terms of the plan;

i. Whether Defendants failed to provide an annual pension benefit statement as required by 29 U.S.C. §§ 1025(a);

j. The proper form of equitable, injunctive relief; and

k. The proper measure of monetary relief.

135. Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

136. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as removal of fiduciaries, would be dispositive of non-party interests. The accounting and restoration of plan assets that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other plan participants.

137. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual

prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I
## <u>FAILURE TO TERMINATE SEVERANCE PLAN</u>
### (By Plaintiffs and Class against all Defendants)

138.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

139.    In October 2018, the Severance Plan filed its Form 5500 for the year ending December 31, 2017. Note 13 of the Independent Auditor's Report attached to the Form 5500, states: "During the year ended December 31, 2017, two significant employers decertified from the related Union and ceased contributing to the Fund effective July 1, 2017 and December 1, 2017. In 2017 these employer's [sic] accounted for approximately 75% of the total contributions received during the year." (Ex. E-3, Auditor's Report, p.14.)

140.    At least one if not both of the employers that withdrew in 2017 was Parsec.

141.    There is "a rebuttable presumption that a 20 percent or greater reduction in plan participants is a partial termination and that a smaller reduction is not . . . ; above 40 percent, it should be conclusively presumed to be a partial termination." *Matz v. Household Int'l Tax Reduction Inv. Plan*, 388 F.3d 570, 577-78 (7th Cir. 2004); Rev. Rul. 2007-43. "The court . . . bases the 20 percent calculation on the ratio of those participants who lose coverage, whether or not vested, to all participants, whether or not vested." Rev. Rul. 2007-43.

142.    Because Parsec is no longer a party to a CBA requiring contributions to the Severance Plan and/or because the withdrawal of two Parsec bargaining units of employees caused a 75% reduction in contributions, the Severance Plan incurred either a termination or partial termination of the plan under 26 U.S.C. § 411(d)(3) and 26 C.F.R. § 1.413-1(c)(3).

143.    Participants affected by the portion of the plan that experiences a partial termination have the same right as those in a terminated plan.

144.    In a terminated plan, participants have a right to their full account balance as soon as administratively feasible, and usually within one year after plan termination.

145.    Defendants failed to distribute benefits within one year from the date that the Severance Plan incurred a partial termination by law.

WHEREFORE, pursuant to 29 U.S.C. § 1132(a)(1)(B) Plaintiffs respectfully request a judgment against Defendants as follows:

(a) Certifying that the action may be maintained as a class action, certifying Plaintiffs as Class representatives, and designating Plaintiffs' counsel as counsel for the Class;

(b) Finding that the Severance Plan terminated with respect to Plaintiffs and Class members and that Plaintiffs and Class members are entitled to an immediate distribution of their benefits;

(c) Requiring Defendants to distribute benefits due to Plaintiffs and Class members;

(d) Awarding attorneys' fees and costs to Plaintiffs as permitted by law, including but not limited to 29 U.S.C. § 1132(g); and

(e) Awarding any other relief that the Court deems just and proper.

## COUNT II
## FAILURE TO TERMINATE 401(k) PLAN
### (By Plaintiffs and Class against all Defendants)

146.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

147.    In October 2018, the NPWU 401(k) Plan filed its Form 5500 for the year ending December 31, 2017.  The NPWU 401(k) Plan indicated that there was a total of one (1) employer "obligated to contribute to the plan" during the year.  (Ex. F, Part II, Line 7.)

148.    Because Parsec was a contributing employer to the NPWU 401(k) Plan during the year ended December 31, 2017, Parsec must have been the only contributing employer in 2017.

149.    Because Parsec withdrew from the NPWU 401(k) Plan during the year ended December 31, 2017, the withdrawal of Parsec left no remaining contributing employers to the NPWU 401(k) Plan during the year ended December 31, 2017.

150.    Under Article 9.2 of the NPWU 401(k) Plan document, the plan must automatically terminate "if no Collective Bargaining Agreement provides for any Employer Contributions or 401(k) Savings Contribution to the Plan."  (Ex. C, p. 28.)

151.    Therefore, the 401(k) Plan automatically terminated when Parsec ceased contributing to the plan in 2017, and the 401(k) Plan was required to distribute all of the benefits to Plaintiffs and Class members within one year.

152.    In the alternative, the 401(k) Plan terminated under 26 U.S.C. § 411(d)(3) and 26 C.F.R. § 1.413-1(c)(3) with respect to Plaintiffs and Class members when Parsec withdrew from the 401(k) plan.  Because Parsec no longer is a party to a CBA requiring contributions to the NPWU 401(k), the Plan incurred a complete termination.

153.    Participants affected by the portion of the plan that experiences a termination or partial termination have the same right as those in a terminated plan.

154.    In a terminated plan, participants have a right to their full account balance as soon as administratively feasible, and usually within one year after plan termination.

155. Defendants failed to distribute benefits within one year from the date that a termination of the NPWU 401(k) Plan occurred by the terms of the plan and/or by law because of the complete termination of employer contributions.

WHEREFORE, pursuant to 29 U.S.C. § 1132(a)(1)(B) Plaintiffs respectfully request a judgment against Defendants as follows:

(a) Certifying that the action may be maintained as a class action, certifying Plaintiffs as Class representatives, and designating Plaintiffs' counsel as counsel for the Class;

(b) Finding that the 401(k) Plan terminated with respect to Plaintiffs and Class members and that Plaintiffs and Class members are entitled to an immediate distribution of their benefits;

(c) Requiring Defendants to distribute benefits due to Plaintiffs and Class members;

(d) Awarding attorneys' fees and costs to Plaintiffs as permitted by law, including but not limited to 29 U.S.C. § 1132(g); and

(e) Awarding any other relief that the Court deems just and proper.

## COUNT III
## BREACH OF FIDUCIARY DUTY OF LOYALTY:
## MAINTAINING TERMS THAT VIOLATE ERISA AND THE CODE
### (By Plaintiffs and Class against all Defendants)

156. Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

157. 29 U.S.C. § 1103(c)(1) provides that the assets of a plan shall be held "for the exclusive purpose of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

158. 29 U.S.C. § 1104(a)(1)(A)(i) and (ii) provide that a fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

159.    29 U.S.C. § 1109(a) provides that any person who breaches her or his fiduciary duties "shall be personally liable to make good to such plan any losses to the plan resulting from such breach . . . and shall be subject to such other equitable or remedial relief as the court may deem appropriate., including removal of such fiduciary."

160.    The failure of Defendants to amend the plan terms to allow for a transfer of assets to participants' new plan following a certified change in bargaining representative violates their obligation to hold assets in trust for the exclusive purpose of providing benefits to participants.

161.    Defendants are holding Plaintiffs' and Class members' assets for the benefit of participants whom are still represented by NPWU, as well as for the benefit of NPWU-affiliated employees and fiduciaries of the plan, but not for the benefit of Plaintiffs and Class members who wish for their accounts to be transferred to another qualified plan.

162.    The threats by NPWU-affiliated fiduciaries during the election that participants would lose all control over their accounts if they decertified NPWU as their bargaining representative evidences the intent of the NPWU-appointed fiduciaries to maintain the restrictive plan provision for a purpose other than to provide benefits to participants.  This improper purpose is further evidenced by the Retirement Plans' terms allowing for a distribution of benefits in the event that a participant leaves the NPWU for another non-union position with the same employer but not in the event that the participant leaves the NPWU to be represented by a new union.  The adoption of such a provision was a breach of the duty of loyalty from its inception, and a violation of the Trust Agreement, and the failure to take corrective action to amend it constitutes an ongoing violation.

163.    The Retirement Plans' restriction on distributing or otherwise transferring benefits following a certified change in bargaining representative also violates the Code's requirements

for qualified trusts. 26 U.S.C. §§ 401(a)(14)(c), 401(k)(10), and 411(d)(3) collectively mandate that, in the case of defined contributions plans, the plans provide for a distribution of benefits upon termination of the plan or termination of the employment relationship with the plan sponsor. When Parsec ceased to be a contributing employer, Plaintiffs and Class members no longer had an employment relationship with the plan sponsor, and the Retirement Plans were obligated to allow for a distribution or transfer of Plaintiffs' and Class members' benefits.

164. Article 6.6. of the Severance Plan Document and Article 6.7 of the 401(k) Plan Document allow "direct rollovers" of distributions. In pertinent part, they provide: "a distributee may elect to have all or any portion of an eligible rollover distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover." (Ex. B, p.12; Ex. C, p.17.)

165. Article 10.5 of the Severance Plan Document and Article 11.4 of the 401(k) Plan Document authorize the transfer of plan assets from the respective plans to another retirement plan under certain conditions. (Ex. B, p.18; Ex. C, p.31). They provide:

> If this Plan . . . transfers in whole or in part its assets and liabilities to any other plan of deferred compensation maintained or to be established for the benefit of all or some of the Participants of the Plan, the assets of the Trust applicable to such Participants shall be transferred to the other trust only if (i) each Participant in the Plan would remain entitled immediately after the . . . transfer to receive a benefit (determined as if the plan then terminated) which is equal to or greater than the benefit he would have been entitled to receive . . . ; (ii) resolutions of the Trustees and of any new or successor employer of the affected Participants shall authorized such transfer of assets . . . ; and (iii) such other plan is qualified under Sections 401 and 501(a) of the Code.

166. Therefore, the Retirement Plans allow for the rollover of Plaintiffs' accounts into the Teamsters 401(k) Plan.

167. By not taking appropriate action in the best interest of participants to amend the Retirement Plans to permit the transfer of Plaintiffs' account balances into the Teamsters 401(k) Plan or to permit individual rollovers to another qualified plan, Defendants have breached their

fiduciary obligations imposed by 29 U.S.C. §§ 1103(c)(1), 1104(a)(1)(A)(i), 1104(a)(1)(D), and are risking the qualified status of the plan.

WHEREFORE, pursuant to 29 U.S.C. §§ 1132(a)(2) and/or (a)(3), Plaintiffs respectfully request a judgment against Defendants as follows:

    (a) Certifying that the action may be maintained as a class action, certifying Plaintiffs as Class representatives, and designating Plaintiffs' counsel as counsel for the Class;

    (b) Finding that Defendants have breached their fiduciary responsibilities in adopting and maintaining Plan amendments preventing Plaintiffs and Class members from obtaining transfers or rollovers of their account balances;

    (c) Requiring Defendants (1) to amend the Trust Agreements, Plan Documents and/or SPDs to allow Plaintiffs and Class members to transfer their account balances to another multiemployer retirement plan following a change in collective bargaining representative; (2) upon request, to transfer the account balances of Plaintiffs and Class members to the Teamsters 401(k) Plan or an alternate qualified retirement plan; (3) upon request of Plaintiffs and Class members no longer in the Elwood Bargaining Unit, to transfer their account balances to the Teamsters 401(k) Plan or an alternate qualified retirement plan;

    (d) Removing Defendants Senese, Gibson, Diaz, Malloy, and Gore as trustees of the Retirement Plans; removing Defendant Meltreger as Plan Manager of the Retirement Plans; and permanently enjoining all Defendants from serving as trustees, fiduciaries or service providers for the Retirement Plans and any other employee benefit plan;

    (e) Awarding attorneys' fees and costs to Plaintiffs as permitted by law, including but not limited to 29 U.S.C. § 1132(g); and

    (f) Awarding any other relief that the Court deems just and proper.

## COUNT IV
### BREACH OF FIDUCIARY DUTY OF LOYALTY:
### EXCESSIVE, UNREASONABLE, AND DUPLICATIVE ADMINISTRATIVE FEES
**(By Plaintiffs and Class against all Defendants)**

168. Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

169.    29 U.S.C. § 1104(a)(1)(A)(ii) provides that a fiduciary must "discharge his duties with respect to a plan . . . for the exclusive purpose of defraying reasonable expenses of administering the plan."

170.    Defendants' failure to transfer Plaintiffs' account balances from the Retirement Plans to the Teamsters 401(k) Plan has caused Plaintiffs to incur duplicative administrative expenses in participating in both the NPWU Retirement Plans and the Teamsters 401(k) Plan. Indeed, the administrative costs of participating only in the Teamsters 401(k) Plan would be significantly lower based on the administrative expense to total expense ratio of 1% in the Teamsters 401(k) plan versus the ratio of 25% to 31% in the Severance Plan.

171.    Defendants' failure to pay accounts to over 10,000 participants found by the DOL as being entitled to benefits from the Severance Plan has caused Plaintiffs to incur unnecessary and unreasonable administrative expenses associated with those individual accounts.

172.    Defendants' unreasonable payments to service providers and fiduciaries some of whom are also employees or officers of NPWU have caused the Funds to incur unnecessary and unreasonable administrative expenses.

173.    29 U.S.C. § 1106(a)(1) prohibits, *inter alia*, Defendants from engaging in the "lending of money or other extension of credit between the plan and a party in interest" or "transfer[ing] to, or us[ing] by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(b)(1) prohibits, *inter alia*, Defendants from "deal[ing] with the assets of the plan in [their] own interest or for [their] own account."

174.    29 U.S.C. § 1106(b)(2) prohibits Defendants from "act[ing] in any transaction involving the plan on behalf of a party (or represent[ing] a party) whose interest are adverse to the interests of the plan or the interests of its participants or beneficiaries."

175.    By using the Severance Plan assets to make loans to the Insurance Fund, Defendants have engaged in prohibited transactions in violation of §§ 1106(a) and (b).

176.    By paying unreasonable compensation from the Severance Fund to Defendant Meltreger and employees of the Retirement Plans who are NPWU officers or employees, and/or relatives of plan fiduciaries, Defendants have engaged in prohibited transactions.

177.    By failing to pay benefits to over 10,000 participants or beneficiaries who are currently entitled to payment of their account balances, Defendants have unlawfully benefited from the additional investment income that the account balances have generated, which have allowed Defendants to pay Defendants Senese (or a relative), Defendant Meltreger, and Krol & Associates unreasonably high compensation.

178.    By failing to allow for the transfer of Plaintiffs' and Class members' accounts, Defendants have unlawfully benefited from the additional investment income that the account balances have generated, which have allowed Defendants to pay Defendants Senese (or a relative), Defendant Meltreger, and Krol & Associates unreasonable compensation.

179.    By failing to allow for the transfer of Plaintiffs' and Class members' accounts, Defendants have caused Plaintiffs and Class members to incur duplicative, unreasonable, and/or excessive administrative costs.

180.    Upon information and belief, Defendants have also used investment income generated from the account balances of the more than 10,000 participants who are entitled to payment of their benefits to distort the overall investment performance of the fund, to conceal the reasonableness of administrative costs, and to obscure the method and reasonableness of allocation of investment gains and losses to individual accounts.  Through this prohibited

transaction, which is continuing in nature, Defendants engaged in self-dealing and/or transferring plan assets for the benefit of a party in interest, in violation of 29 U.S.C. § 1106(a)(1) and (b)(1).

181.    To the extent any individual Defendants did not directly benefit from any of the above transactions, they are liable for the prohibited transactions of their co-fiduciaries under 29 U.S.C. § 1105(a)(2) for their failure to prudently administer the plan and defray the costs of the plan under 29 U.S.C. § 1104(a)(1)(A) and (B).

182.    As a result of any or all of the above expenses and transactions, Defendants have breached their fiduciary obligations imposed by 29 U.S.C. § 1104(a)(1)(A)(ii) and engaged in prohibited transactions in violation of 29 U.S.C. § 1106(a)(1) and (b)(1).

183.    29 U.S.C. § 1109(a) provides that any person who breaches her or his fiduciary duties "shall be personally liable to make good to such plan any losses to the plan resulting from such breach . . . and shall be subject to such other equitable or remedial relief as the court may deem appropriate., including removal of such fiduciary."

WHEREFORE, pursuant to 29 U.S.C. §§ 1132(a)(2) and/or (a)(3), Plaintiffs respectfully request a judgment against Defendants as follows:

(a) Certifying that the action may be maintained as a class action, certifying Plaintiffs as Class representatives, and designating Plaintiffs' counsel as counsel for the Class;

(b) Finding that Defendants have breached their fiduciary responsibilities and caused losses to the Plans (and therefore to Plaintiffs and Class members) and are liable to the Plans, Plaintiffs, and Class members as a result of the payment of unreasonable or excessive expenses and because of engaging in prohibited transactions;

(c)  Requiring Defendants to provide an accounting of all loans and repayments involving parties in interest, all amounts of compensation and expenses paid by the Plan to Defendants and all fees and expenses paid to Krol & Associates;

(d) Determining the amount of compensation, expenses and service fees that reasonably could have been paid by the Retirement Plans to the Defendants, any parties in interest, and to Krol & Associates, and finding the Defendants liable to repay the

Retirement Plans for the amounts paid in excess of the reasonable compensation, expenses, and service fees.

(e) Requiring Defendants to provide an accounting of all amounts owed to individuals who are currently entitled to payment of benefits from the Retirement Plans and a detailing of all efforts made by the Retirement Plans to make such payments;

(f) Requiring Defendants to reimburse the Retirement Plans for the amounts of any excessive or unreasonable compensation and service provider fees found by the Court and to pay with interest to the Retirement Plans all amounts that have been unlawfully loaned or transferred by any means to any other NPWU-related entity, fiduciary, party in interest, or any other entity;

(g) Removing Defendants Senese, Gibson, Diaz, Malloy, and Gore as trustees of the Retirement Plans; removing Defendant Meltreger as Plan Manager of the Retirement Plans; and permanently enjoining all Defendants from serving as trustees, fiduciaries or service providers from the Retirement Plans and any other ERISA-governed employee benefit plan; and

(h) Awarding attorneys' fees and costs to Plaintiffs as permitted by law, including but not limited to 29 U.S.C. § 1132(g).

**COUNT V:**
**BREACH OF FIDUCIARY DUTY OF PRUDENCE**
**(By Plaintiffs and Class against all Defendants)**

184.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

185.     29 U.S.C. § 1104(a)(1)(B) provides that a fiduciary must "discharge his duties with respect to a plan . . . with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

186.     A prudent fiduciary acting solely in the interest of participants and beneficiaries would have terminated the Retirement Plans with respect to Plaintiffs' and Class members when Parsec withdrew from the Plans in 2017, and would have allowed for a distribution of benefits or rollover of account balances within one year. Defendants failed to do so.

47

187.    A prudent fiduciary acting solely in the interest of participants and beneficiaries would amend the Retirement Plans to allow for the transfer of account balances following a change in bargaining representative. Defendants failed to do so.

188.    A prudent fiduciary acting solely in the interest of participants and beneficiaries would find that the NPWU officers serving as Trustees of the Retirement Plans had conflicts of interest with respect to the maintenance of restrictive Plan provisions preventing the transfer of assets of participants who had voted to terminate representation by the NPWU. Such Union Trustees should have recused themselves from decisions concerning transferring Plaintiffs' accounts and the Employer Trustees should have required the Union Trustees to recuse themselves from such decisions.  Defendants failed to do so

189.    A prudent fiduciary acting solely in the interest of participants and beneficiaries would make consistent and effective efforts to locate and pay benefits to inactive participants who are entitled to payment of their account balances. Defendants failed to do so.

190.    A prudent fiduciary acting solely in the interest of participants and beneficiaries would evaluate whether the services provided by Krol & Associates could be provided by an experienced service provider for a more reasonable rate, and would have employed an independent accounting firm to determine whether the costs of services provided by a consultant to multiple parties in interest were allocated correctly among the parties.  A prudent fiduciary would have also determined whether the services provided by Krol & Associates were duplicative of services provided by other service providers that the Plans selected or retained. Defendants failed to do so.

191.    A prudent fiduciary acting solely in the interest of participants and beneficiaries would require Krol & Associates to regularly report to the Board of Trustees and would

periodically review reports concerning the work performed by Krol & Associates to determine whether the services justified the fees paid by the plan. Defendants failed to do so.

192.    A prudent fiduciary acting solely in the interest of plan participants and beneficiaries would review the Form 5500 and determine whether it accurately informs participants of payments to parties in interest and would require the Severance Plan's Form 5500 to identify Defendants Senese (or his relative) and other NPWU officers receiving compensation from the plan as parties in interest. Defendants failed to do so.

193.    A prudent fiduciary acting solely in the interest of participants and beneficiaries would regularly review financial reports of the plan and determine whether the administrative expenses of the plan were reasonable. Defendants failed to do so.

194.    A prudent fiduciary would find that the compensation paid to Defendants Senese (or his relative) and Meltreger were not reasonable. Defendants failed to do so.

195.    By each individual failure described above, Defendants have breached their fiduciary obligations imposed by 29 U.S.C. § 1104(a)(1)(B).

WHEREFORE, pursuant to 29 U.S.C. §§ 1132(a)(2) and/or (a)(3), Plaintiffs respectfully request a judgment against Defendants as follows:

(a) Certifying that the action may be maintained as a class action, certifying Plaintiffs as Class representatives, and designating Plaintiffs' counsel as counsel for the Class;

(b) Finding that Defendants have breached their fiduciary responsibilities and caused losses to the Plans (and therefore to Plaintiffs and Class members) and are liable to the Plans, Plaintiffs, and Class members as a result of the payment of unreasonable or excessive expenses and because of engaging in prohibited transactions;

(c)  Requiring Defendants to provide an accounting of all loans and repayments involving parties in interest, all amounts of compensation and expenses paid by the Plan to Defendants and all fees and expenses paid to Krol & Associates;

(d) Determining the amount of compensation, expenses and service fees that reasonably could have been paid by the Retirement Plans to the Defendants, any parties in

interest, and to Krol & Associates, and finding the Defendants liable to repay the Retirement Plans for the amounts paid in excess of the reasonable compensation, expenses, and service fees.

(e) Requiring Defendants to provide an accounting of all amounts owed to individuals who are currently entitled to payment of benefits from the Retirement Plans and a detailing of all efforts made by the Retirement Plans to make such payments;

(f) Requiring Defendants to reimburse the Retirement Plans for the amounts of any excessive or unreasonable compensation and service provider fees found by the Court and to  pay with interest to the Retirement Plans all amounts that have been unlawfully loaned or transferred by any means to any other NPWU-related entity, fiduciary, party in interest, or any other entity;

(g) Removing Defendants Senese, Gibson, Diaz, Malloy, and Gore as trustees of the Retirement Plans; removing Defendant Meltreger as Plan Manager of the Retirement Plans; and permanently enjoining all Defendants from serving as trustees, fiduciaries or service providers from the Retirement Plans and any other ERISA-governed employee benefit plan; and

(h) Awarding attorneys' fees and costs to Plaintiffs as permitted by law, including but not limited to 29 U.S.C. § 1132(g).

## COUNT VI
## FAILURE TO SUPPLY REQUESTED INFORMATION
### (By Plaintiffs Dean and Wollenzien against all Defendants)

196.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

197.     29 U.S.C. §§ 1024(b)(1), 1024(b)(4), 1025(a), 1132(c)(1), and 1133(1) and (2), collectively, require the Boards of Trustees of the NPWU Plans, as Administrator, to provide to participants, upon request, a copy of the NPWU Plan's SPDs, latest annual reports, a summary of material modifications, the trust agreement any other instruments under which the plan is established or operated, annual pension benefit statements, and a written explanation of the reasons for a denial, along with documents related to the claim that would allow the participant a full and fair review of the denial.

198.    On March 26, 2018, Plaintiffs submitted a joint request for:

a)    the latest updated summary plan description, including all amendments and Summaries of Material Modifications;
b)   the latest annual report;
c)    the latest Form 5500;
d)   the Trust Agreement;
e)   any applicable collective bargaining agreements;
f)    any other instruments under which the plan is established and operated;
g)   any periodic actuarial report received by the plan during the last 5 plan years;
h)   any quarterly, semi-annual, or annual financial report prepared for the plan by any plan investment manager or advisor or other fiduciary during the last 5 plan years; and
i)    audited financial statements of the plan for the last 5 plan years.

199.    Plaintiffs included with the March 26 request a $15.00 check made out to the NPWU Severance Plan and a $15.00 check made out to the NPWU 401(k) Plan for advanced payment of copying costs.

200.    On or about May 9, 2018, Defendants sent Plaintiffs copies of: (1) the Severance Plan and NPWU 401(k) plan documents; (2) the Severance Plan SPD (but not the 401(k) Plan SPD); (3) the collective bargaining agreement between NPWU and Parsec; (4) the Severance Plan and NPWU 401(k) Plan Trust Agreements; (5) the Severance Plan Form 5500 for 2016 (but not the NPWU 401(k) Plan Form 5500s); and the Severance Plan Audited Financial Statements for 2011-2016 (but not the 401(k) Plan Audited Financial Statements).

201.    On October 26, 2018, Plaintiffs sent another request for documents along with their claim for benefits, continuing to request documents that were missing from their March 26 request, and requesting additional documents that participants are entitled to request, including a written decision in the event of a denial, a list of individuals who participated in the decision, plaintiffs' latest annual statement of benefits for each plan, and memoranda, policies, and other communications concerning the plan provision relied upon by the NPWU Plans in making their decision, among other documents.  Included with the letter was a check payable to the Severance

Plan in the amount of $75.00 for advance payment of copying costs, and a check payable to the NPWU 401(k) Plan in the amount of $25.00 for advance payment of copying costs.

202.    As of the date of the filing of this Complaint, Defendants have not provided any of the requested documents or otherwise responded.

203.    29 U.S.C. § 1132(c)(1) provides for penalties of $110 per day per violation for Defendants' failure to provide the information requested by Plaintiffs within thirty days.

204.    Accordingly, Plaintiffs demand, pursuant to 29 U.S.C. §§ 1024(b)(1), 1024(b)(4), 1025(a), 1132(a)(1)(A) and (c)(1), and 1133(1) and (2), penalties in the amount of $110 per day commencing April 25, 2018 and through the date of judgment.

205.    Plaintiffs also demand, pursuant to 29 U.S.C. §§ 1132(a)(1)(A), (a)(3) and/or (c)(1), an order requiring Defendants to provide them the information requested in their March 2018 and October 2018 information requests.

WHEREFORE, Plaintiffs respectfully request a judgment against Defendants as follows:

(a) Finding that Defendants breached their fiduciary duties by failing to provide Plaintiffs with documents within 30 days of their written information requests;

(b) Awarding penalties to each Plaintiff at the rate of $110 per day per violation;

(c) Ordering Defendants to provide Plaintiffs with all information requested;

(d) Awarding attorneys' fees and costs to Plaintiffs as permitted by law, including but not limited to 29 U.S.C. § 1132(g); and

(e) Awarding any other relief that the Court deems just and proper.

## COUNT VI
## FAILURE TO PROVIDE PENSION BENEFIT STATEMENTS
### (By Plaintiffs and Class against all Defendants)

206.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

207. 29 U.S.C. § 1025(a)(1)(A)(ii) requires Defendant Board of Trustees to provide annual pension benefit statements to all participants containing the information described in 29 U.S.C. § 1025(a)(2).

208. Within at least the four (4) years prior to filing this lawsuit, Defendant Board of Trustees failed to provide Plaintiffs and Class members with annual pension benefit statements meeting all of the requirements of 29 U.S.C. § 1025(a).

209. 29 U.S.C. § 1132(c)(1) provides for penalties of $110 per day per violation for the failure to provide pension benefit statements in accordance with 29 U.S.C. § 1025(a).

210. Plaintiffs demand, pursuant to 29 U.S.C. §§ 1132(a)(1)(A) and (c)(1), penalties of $110 per day for each violation from January 1, 2015 through the date of judgment.

211. Plaintiffs also demand, pursuant to 29 U.S.C. §§ 1025(a), 1132(a)(1)(A), (a)(3) and/or (c)(1), an order requiring Defendants to provide Plaintiffs and Class annual benefit statements meeting all of the requirements of 29 U.S.C. §§ 1025(a) unless and until they no longer have account balances.

WHEREFORE, Plaintiffs respectfully request a judgment against Defendants as follows:

(a) Certifying that the action may be maintained as a class action, certifying Plaintiffs as Class representatives, and designating Plaintiffs' counsel as counsel for the Class;

(b) Finding that Defendants breached their fiduciary duties by failing to provide Plaintiffs and Class with documents within 30 days of their written requests;

(c) Awarding penalties of $110 per day per violation to each Plaintiff and Class member;

(d) Ordering Defendants to provide Plaintiffs and Class with an annual pension benefit statement meeting all of the requirements of 29 U.S.C. § 1025(a) unless and until they no longer have account balances;

(e) Awarding attorneys' fees and costs to Plaintiffs as permitted by law, including but not limited to 29 U.S.C. § 1132(g); and

(f) Awarding any other relief that the Court deems just and proper.

Respectfully submitted,
/s/ Elizabeth L. Rowe
Elizabeth L. Rowe
An Attorney for the Plaintiffs

J. Peter Dowd (ARDC# 0667552)
George A. Luscombe III (ARDC# 6290097)
Elizabeth L. Rowe (ARDC# 6316967)
DOWD, BLOCH, BENNETT, CERVONE,
     AUERBACH & YOKICH
8 S. Michigan Ave. – 19th Floor
Chicago, IL 60602
312-372-1361