**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| WALTER DEAN and DEAN WOLLENZIEN, individually, and on behalf of those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL PRODUCTION WORKERS UNION SEVERANCE TRUST PLAN, et al.,<br><br>Defendants. | Case No. 1:19-cv-02694<br><br>Judge John Robert Blakey |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Walter Dean and Dean Wollenzien work for Parsec, Inc. During a period of their employment, Plaintiffs belonged to the National Production Workers Union (NPWU) and participated in the NPWU's Severance Trust Plan (Severance Plan) and 401(k) Retirement Plan (401(k) Plan) (collectively, the NPWU Plans). In 2017 the NPWU's Elmwood Bargaining Unit (comprising 507 Parsec employees, including Plaintiffs) voted to switch to the Teamsters' Local Union No. 179. Afterwards Plaintiffs began participating in the Teamsters' 401(k) plan (Teamsters' Plan).

Defendants Joseph Vincent Senese, Rosie Gibson, Shawn Ford, Scott Gore, and Jose Diaz comprise the Defendant Board of Trustees of the NPWU Plans and serve as Plan Administrators. Defendant James Meltreger serves as the Plan Manager of the Plans. Plaintiffs also bring this suit against the Plans.

After failed attempts to get Defendants to rollover the Plans to the Teamsters' Plan, Plaintiffs filed this suit alleging: (1) failure to terminate the Severance Plan; (2) failure to terminate the 401(k) Plan; (3) breach of fiduciary duty or settlor obligation by maintaining illegal plan terms; (4) breach of fiduciary duty of loyalty for excessive and unreasonable administrative fees; (5) breach of fiduciary duty of prudence; (6) failure to supply requested information; and (7) failure to provide pension benefit statements. [23]. Defendants now move this Court to dismiss Plaintiffs' Second Amended Complaint, arguing that Plaintiffs have failed to state a claim. [45]. For the reasons stated below, this Court grants in part and denies in part Defendants' motion to dismiss.

## BACKGROUND

Parsec, Inc. employs Plaintiffs. [23] ¶ 5. As Parsec employees, Plaintiffs belong to the Elmwood Bargaining Unit, which the NPWU formerly represented. *Id*. ¶ 7. Plaintiffs participated in NPWU's Severance Plan and 401(k) Plan, both of which constitute defined contribution plans. *Id*. ¶¶ 6–11. The value of each participant's account in the Severance Plan is based solely on employer contributions made on the participant's behalf (plus any net investment income allocated to the participant's account, less allocable portions of plan administration fees and any net investment losses). *Id*. at ¶ 35. The value of each participant's account in the 401(k) Plan is based on employer contributions made on the participant's behalf, plus any voluntary contributions the participant makes into the plan (plus any investment income or losses directly attributable to the participant's account, less allocable portions of plan

1

administration fees. *Id.* Each participant's right to receive benefits under both Plans is fully vested immediately. *Id.*

In 2017, Teamsters Local 179 prevailed over NPWU after a representation election. *Id.* ¶¶ 23, 25. After the election, Parsec began making contributions to the Teamsters Plan instead. *Id.* ¶ 25. Teamsters also requested that NPWU trustees rollover Parsec participants' accounts into the Teamsters Plan, or adopt NPWU Plan amendments allowing such transfers. *Id.* ¶¶ 26, 43. Yet Defendants declined to do so, claiming the terms of the NPWU Plans did not allow for such actions, and insisting that participants were precluded from obtaining or rolling over their accounts until they no longer worked for Parsec. *Id.* ¶¶ 24, 26. In response, Teamsters' attorneys requested documents from Defendants relating to their claim that the NPWU Plans bar them from rolling over the accounts. *Id.* ¶¶ 44–53; [34-1]. Defendants declined to produce all the requested documents. *Id.*

By way of the Plans' 2017 Form 5500s, Plaintiffs later discovered that Parsec's withdrawal caused a 70% and 100% reduction in participants of the Severance Plan and 401(k) Plan, respectively. [23] ¶ 54. Plaintiffs, relying upon a variety of federal statutes and regulations, from the Employee Retirement Income Security Act (ERISA) to the Internal Revenue Code (IRC), then demanded that the Trustees partially terminate the Severance Plan and the 401(k) Plan, and immediately distribute Parsec employees' balances. *Id.* ¶ 55. Defendants declined to respond, and Plaintiffs then filed this action. *Id.* ¶¶ 55–58.

2

**LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must provide a "short and plain statement of the claim" showing that the pleader merits relief, Fed. R. Civ. P. 8(a)(2), so the defendant has "fair notice" of the claim "and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint must also contain "sufficient factual matter" to state a facially plausible claim to relief—one that "allows the court to draw the reasonable inference" that the defendant committed the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556, 570). This plausibility standard "asks for more than a sheer possibility" that a defendant acted unlawfully. *Id.* (quoting *Twombly*, 550 U.S. at 557).

In evaluating a complaint under Rule 12(b)(6), this Court accepts all well-pleaded allegations as true and draws all reasonable inferences in the plaintiff's favor. *Id.* This Court does not, however, accept a complaint's legal conclusions as true. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

**ANALYSIS**

I. **Counts I and II**

A. <u>Plaintiffs' Legal Theory</u>

Plaintiffs first seek distribution of benefits pursuant to 29 U.S.C. § 1132(a)(1)(B), which provides that plan participants and beneficiaries may bring a civil action to recover benefits due *under the terms of the plan*. [23] ¶¶ 100, 119, 150 (emphasis added). Plaintiffs contend that the NPWU Plans terminated; and, thus,

3

Defendants must distribute or rollover the NPWU Plans' benefits into the Teamsters Plan. *Id*. ¶¶ 85, 86, 100, 109–13, 119. For their part, Defendants argue that the NPWU Plans contain no language requiring the NPWU Plans to immediately terminate and distribute benefits. [28] at 3. As Defendants point out, the NPWU Plans limit the participants' entitlement to receive distributions to severance, death, or attainment of age 65. [28] at 4; *see* [23-1] (Ex. B) at art. VI; [23-1] (Ex. C) at art. VI. And both NPWU Plans define "Severance"[1] as occurring only when a participant separates from their current employer or transfers to a nonunion position for the same employer, which has not happened here. *See* [23-1], Ex. B § 2.16, 6.1; Ex. C § 2.20, 6.1. Indeed, the Severance Plans' Summary Plan Description (SPD) even provides that "a Severance <u>does not occur</u> if a Participant is employed by a Contributing Employer that decertifies from the Union and the Participant remains employed with employer." [23] ¶ 41; [23-1] (Ex. D) at 5 (emphasis in original).

Ultimately, no language in the NPWU Plans themselves supports Plaintiffs' demand that the contributions rollover immediately. Plaintiffs concede as much in their opposition brief, claiming that the "plan terms are irrelevant." [30] at 6. Thus, in order to support their claim to recover benefits due under the terms of the NPWU Plans, Plaintiffs argue that this Court must read into them certain terms arising from statutory provisions purportedly mandating a rollover. *Id*.

As to the terms they seek to read into the NPWU Plans, Plaintiffs argue that I.R.C. § 411(d)(3) and 29 U.S.C. § 1103(d)(1) working together require immediate

---

[1] The Plans' other conditions of death or reaching 65 years of age are not relevant to this motion.

4

distribution. [30] at 7–16. Plaintiffs claim that Parsec's withdrawal led to the NPWU Plans' "termination" or partial termination as described in I.R.C. § 411(d)(3). [30] at 7–16 (citing *Matz v. Household Int'l Tax Reduction Inv. Plan*, 388 F.3d 570, 577–78 (7th Cir. 2004)); [23] ¶¶ 89–92, 111–13 (arguing that a reduction in plan participants caused at least a partial termination and because the Plans terminated, ERISA and the Internal Revenue Code provide that participants have a right to distribution of their accounts). This termination, they claim in turn, triggered obligations under 29 U.S.C. § 1103(d)(1), eventually requiring a distribution of assets. [30] at 9. Section 1103(d)(1) states: "Upon termination of a pension plan . . . the assets of the plan shall be allocated in accordance with the provisions of section 1344 of this title, except as otherwise provided in regulations of the Secretary."

I.R.C. § 411(d)(3) and *Matz*, however, do not apply here. Congress enacted § 411(d)(3) for the purpose of protecting employees from forfeiture under plans that do not immediately vest. I.R.C. § 411(d)(3) ("the rights of all affected employees to benefits accrued to the date of such termination, partial termination, or discontinuance, to the extent funded as of such date, or the amounts credited to the employees' accounts, *are nonforfeitable*") (emphasis added); *see also* Rev. Rul. 2007-43, 2007-2 C.B. 45 (2007) (explaining that under § 411(d)(3) a plan will not be qualified unless "upon its partial termination, the rights of all affected employees to benefits accrued to the date of such partial termination, to the extent funded on that date, or the amounts credited to their accounts, are nonforfeitable"); *Matz*, 388 F.3d at 575–76 ("The purpose of section 411(d)(3) of the Internal Revenue Code is to

5

prevent an employer from obtaining a tax windfall at the expense of the not fully vested participants in his plan. But the statute does not provide that plan alterations which result in a tax windfall at the expense of such participants shall be deemed terminations and precipitate full vesting."). Here, neither party disputes that Plaintiffs' contributions fully vested and remain nonforfeitable. *See* [23-1], Ex. B § 3.4, Ex. C § 3.4. Thus, I.R.C. § 411(d)(3) fails to provide a statutory basis to override the plain text of the NPWU Plans, and require, as Plaintiffs suggest, the immediate terminations of those plans.

Moreover, even if the NPWU Plans had terminated under Plaintiffs' theory, Plaintiffs mistakenly contend that 29 U.S.C. § 1103(d)(1) requires distribution within a year. Section 1103(d)(1), however, never mentions "distribution." *See* 29 U.S.C. § 1103(d)(1). Instead, the provision concerns allocations. *Id.* ("Upon termination of a pension plan . . . the assets of the plan shall be *allocated* in accordance with the provisions of section 1344 of this title.") (emphasis added). Using their ordinary, plain-language definitions, the terms "allocation" and "distribution" mean different things. Distribution means disbursement of assets, whereas allocation means designating assets. *Compare* DISTRIBUTION, Black's Law Dictionary (11th ed. 2019) ("The act or process of apportioning or giving out."), *with* ALLOCATION, Black's Law Dictionary (11th ed. 2019) ("1. The amount or share of something that has been set aside or designated for a particular purpose. 2. A designation or apportionment for a specific purpose; esp., the crediting of a receipt or the charging

6

of a disbursement to an account."). This Court finds no indication that Congress intended to depart from the term allocation's ordinary meaning in this Section.

Attempting to conflate the two terms, however, Plaintiffs argue that "allocation" and "distribution" are nonetheless "part of one seamless process." [30] at 10. While the two terms certainly relate to one another—as allocating funds may be a necessary step to undertake prior to distribution—the relationship between the terms does not render them identical; nor does it mean § 1103(d)(1) mandates the immediate distribution of assets upon termination of a plan. Indeed, in § 1344 (the provision that governs the allocation described in § 1103(d)(1)), Congress speaks distinctly of allocation, and then separately of distribution. Compare 29 U.S.C. § 1103(d)(2) ("The assets of a welfare plan which terminates shall be *distributed* in accordance with the terms of the plan, except as otherwise provided in regulations of the Secretary."), *with* 29 U.S.C. § 1103(d)(1) ("Upon termination of a pension plan . . . the assets of the plan shall be *allocated* in accordance with the provisions of section 1344 of this title.") (emphasis added). Thus, given the plain statutory language, the two terms cannot be conflated. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quoting *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir. 1972)) (punctuation in original).

This Court also finds Plaintiffs' § 1103 arguments unpersuasive. [30] at 12–14. Specifically, Plaintiffs claim Congress intended § 1103(d)(1) to require

7

distribution because, in § 1415, Congress requires the transfer of assets to a new plan. But Congress created this rule for defined-*benefit* plans (§ 1415(a)), and not defined-*contribution* plans. *See Aguilar v. Nat'l Prod. Workers Union Severance Tr. Plan*, CV 18-03057 TJH (KLSx), 2018 WL 9543022, at *2 (C.D. Cal. Dec. 19, 2018). If Congress wanted to provide a § 1415(a)-type remedy for participants in defined-contribution plans, it could have done so. It did not.[2]

Next, Plaintiffs argue that Rev. Rule 89-87 entitles them to immediate distribution. [30] at 11 ("Rule 89-87 plainly articulates that a termination triggers the requirement to distribute assets within one year."). But even if the NPWU Plans terminated as Plaintiffs' contend, immediate distribution of assets under § 411(d)(3) and Rev. Rule 89-87 still would not be required. Contrary to Plaintiff's assertions, [23] ¶¶ 92, 103, 112; [30] at 11,Rule 89-87 does not override the plain terms of the NPWU Plans. Instead, Rev. Rule 89-87 addresses whether an amendment to terminate (which has not occurred here) amounts to a termination when the assets are not immediately distributed:

> A pension, profit-sharing or stock bonus plan, under which benefit accruals have ceased, is not terminated if, after an amendment is adopted to terminate the plan, plan assets are not distributed as soon as administratively feasible but are held in the trust which remains in existence in order to make distributions when employees become entitled to receive payments as provided under the terms of the plan as they exist when the amendment is adopted.

---

[2] Plaintiffs also argue that Congress did not include a similar provision for defined-contribution plans, because the partial termination and termination requirements under I.R.C. § 411(d)(3) and 29 U.S.C. § 1103(d)(1) automatically require the plan to distribute assets. [23] at 13. For the reasons already explained above, however, § 411(d)(3) and § 1103(d)(1) do not support Plaintiffs' construction.

8

Rev. Rul. 89-87, 1989-2 C.B. 81 (1989). In short, the provision is irrelevant.

Finally, Plaintiffs argue that the NPWU Plans no longer meet the requirements of I.R.C. § 401(a)—which sets the qualification standards for "forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees," which they allege Rule 89-87 requires. [30] at 11–12. Plaintiffs' claim that, because the NPWU Plans no longer hold benefits for the exclusive benefit of Parsec employees, the law requires distribution. *Id*. Yet Plaintiffs failed to develop such a theory in their complaint as required under Rule 8; [23] ¶¶ 93, 114 (making just two passing references to § 401(a)). Nor may Plaintiffs amend their complaint through their opposition brief. *Bissessur v. Ind. Univ. Bd. of Tr.*, 581 F.3d 599, 603 (7th Cir. 2009). Lastly, and more importantly, Plaintiffs present no legal authority suggesting that the provisions of I.R.C. § 401(a) are obligatory under ERISA. Indeed, the Seventh Circuit upheld a district court's finding that the law provides "no basis" for reading § 401(a) into ERISA. *Reklau v. Merchants Nat. Corp.*, 808 F.2d 628, 631 (7th Cir. 1986).

In sum, this Court finds that Plaintiffs failed to state a legal theory as to why they are entitled to recover immediate benefits due, either through the terms of the Plans themselves or through a relevant statute that this Court must read into those Plans.

    B.  <u>Equitable Relief</u>

Plaintiffs next ask this Court to enjoin Defendants' refusal to terminate or amend the Plans pursuant to 29 U.S.C. § 1132(a)(3) (ERISA § 502(a)(3)). [23] ¶¶ 100,

9

119. Section 502(a)(3) authorizes participants to bring suits to enjoin practices and seek equitable relief for statutory violations. The Supreme Court described this provision as a "catchall" provision that acts as a "safety net" by "offering appropriate equitable relief" for injuries caused by violations that "§ 502 does not elsewhere adequately remedy." *Variety Corp. v. Howe*, 516 U.S. 489, 512 (1996).

Yet, courts in this district have repeatedly held that parties may not bring a § 502(a)(3) claim when subsection (a)(1)(B) provides relief— that is, where participants can recovery benefits due under the terms of the plan itself. *Hakim v. Accenture United States Pension Plan*, 656 F. Supp. 2d 801, 810 (N.D. Ill. 2009) (collecting cases). In other words, when parties, like Plaintiffs here, advance "largely indistinguishable" claims under both §§ 502(a)(1)(B) and 502(a)(3), then courts must dismiss their § 502(a)(3) claims. *Id*. at 811 (citing *Crummett v. Metropolitan Life Ins. Co.*, No. 06-01450(HHK), 2007 WL 2071704, at *2 (D.D.C. July 16, 2007)).

The record makes clear that Plaintiffs advances indistinguishable §§ 502(a)(3) and 502(a)(1)(B) claims. First, their 502(a)(3) and 502(a)(1)(B) claims rely upon identical factual allegations. *Id*.; [23] Counts I, II (asserting the common set of claims for both subsections but then requesting a variety of different remedies). Second, Plaintiffs request that this Court either find that Defendants are legally required to distribute their benefits or enjoin Defendants' unlawful refusal to terminate or amend the plans. [23] ¶¶ 100, 119. The remedy for either request requires Defendants to immediately distribute Plaintiffs' benefits. And courts have held that plaintiffs

10

seeking identical relief under both claims advance indistinguishable §§ 502(a)(3) and 502(a)(1)(B) claims. *Hakim*, 656 F. Supp. 2d at 811 (citing cases).

Because Plaintiffs allege the same facts and seek the same relief under both their §§ 502(a)(3) and 502(a)(1)(B) claims, this Court dismisses Plaintiffs' request for equitable relief under Counts I and II with prejudice.

## II. Count III

Count III alleges breach of fiduciary duty or settlor obligation by maintenance of terms that violate ERISA, the IRC, and the Taft-Hartley Act. Plaintiffs claim that Defendants violated their obligations by enacting provisions that do not allow for distribution even if the employees decertify the union, which Plaintiffs argue benefits the union at the expense of the participants. [23] ¶¶ 123–27; [30] at 16. In their brief, Plaintiffs argue that this obligation springs solely from § 186(c)(5) of the Taft-Hartley Act, apparently conceding that no such claim exists under ERISA or the IRC. [30] at 16–19. Accordingly, Count III's survival turns solely upon whether this count adequately alleges a violation of the Taft-Hartley Act.

In their Second Amended Complaint, Plaintiffs allege Defendants violated their fiduciary duty as set forth in the Taft-Hartley Act. [23] ¶ 135. Yet the code Plaintiffs cite to—29 U.S.C. § 126—does not exist; thus, in their brief, they state that they meant to identify 29 U.S.C. § 186(c)(5) as the basis of their claim. [30] at 16 n.4. But as stated previously, Rule 8 requires plaintiffs, at a minimum, to state the grounds their claims rest upon to give defendants fair notice of what they allege against them. Fed. R. Civ. P. 8; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

11

And again, Plaintiffs attempts to amend their complaint through their brief are inappropriate.[3] *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.").

This argument fails substantively as well. Section 186(a) prohibits employers from contributing to unions. 29 U.S.C. § 186(a). Section 186(c), in turn, provides exemptions for when an employer may financially contribute to a union. 29 U.S.C. § 186(c). These exemptions permit "an employer to contribute to an employee benefit trust fund that satisfies certain statutory requirements" designed to ensure that the funds are not used for "improper purposes." *Cruz v. Cent. States Joint Bd. Health & Welfare Tr. Fund*, No. 93 C 0151, 1993 WL 259444, at *2 n.3 (N.D. Ill. July 7, 1993). Here, the statute fails to provide legal grounds to assert a breach of fiduciary duty claim against Defendants, because there is no allegation that Defendants engaged in financial transactions with the NPWU. For these reasons, this Court dismisses Count III with prejudice.

### III. Count IV

Plaintiffs next allege Defendants breached their fiduciary duty of loyalty by charging excessive and unreasonable administrative fees. [23] ¶¶ 154–160. They allege that the Severance Plan's ratio of total administrative expenses to total expenses oscillated between 30.7% and 25.9% from 2015 to 2017. *Id.* ¶ 154. Plaintiffs

---

[3] Notably, after Defendants moved to dismiss, the Court provided Plaintiffs with an opportunity to amend their complaint to cure any perceived deficiencies, and Plaintiffs declined that opportunity, emphasizing that their claims would rise or fall as pled. [47] at 12–14.

12

claim that these percentages exceed the industry standard for multi-employer *benefit* funds in Illinois, but Plaintiffs also acknowledge that the NPWU Plans constitute defined *contribution* funds rather than benefit funds. *Id.* ¶ 158. Plaintiffs further concede that they failed to find any study of "multi-employer pension plans," *id.* ¶ 157, offering merely a comparison to welfare plans, *id.* ¶ 155.[4]

As currently drafted, Plaintiffs' allegations remain insufficient to plausibly state a claim, because they fail to provide an ostensible factual basis to determine an excessive (rather than reasonable) administrative fee. Plaintiffs' theory that Defendants used excessive fees hinges solely upon their allegations that they exceed those typically charged in benefit funds or welfare plans, neither of which are applicable here. For a plausible claim, Plaintiffs need to allege some facts beyond the expense ratios because ERISA's fiduciary duty does not require Defendants to operate plans with the lowest expense ratios, but rather with reasonable and prudent ones. *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009) ("The fact that it is possible that some other funds might have had even lower ratios is beside the point; nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)"). Thus, this

---

[4] In response, Defendants attack the data relied upon by Plaintiffs and the method of comparison to other plans. [28] at 12–15. Plaintiffs' pleadings also ignore Defendants' "'easy' explanation," *Bouvy v. Analog Devices, Inc.*, No. 19-CV-881 DMS (BLM), 2020 WL 3448385, at *8 (S.D. Cal. June 24, 2020), that the administrative ratios might be higher than other plans' because Defendants categorize all expenses as administrative, *see* [28] at 13 n.5. The ultimate merits of Plaintiffs' claims, however, are not relevant at this stage of the proceedings.

Court dismisses without prejudice Plaintiffs' breach of fiduciary duty claims based upon excessive administrative fees.[5]

## IV. Count V

In Count V, Plaintiffs allege Defendants breached their duty of prudence by paying suspect fees to Krol & Associates, the NPWU Plans' accountant, as well as suspect salaries to Defendants Meltreger (the Plan Manager) and Senese (one of the Plan Administrators and an NPWU employee). [23] ¶¶ 186–90; [23-1] (Exs. E, F, G at Sched. C), and by failing to have an independent auditor review Krol & Associates' services and fees. *Id.* ¶ 197.

ERISA's duty of prudence requires plan fiduciaries to

> discharge [their] duties with respect to a plan . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters in the conduct of an enterprise of like character and with like aims.

29 U.S.C. § 1104(a)(1)(B). In evaluating the duty of prudence, courts look to the process the trustees utilized rather than the results achieved. *Pension Benefit. Guar. Corp ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013); *DeBruyne v. Equitable Life Assur. Soc. of U.S.*, 920 F.2d 457, 465 (7th Cir. 1990).

---

[5] Even though Plaintiffs caption Count IV as a claim regarding excessive administrative fees and refer to it in their brief as a claim for excessive fees [30] at 20, the Second Amended Complaint nevertheless includes references to reporting requirements and prohibited transactions in Count IV. *See, e.g.*, [23] ¶¶ 162–182. Without more clarity in the allegations, this Court cannot infer that Plaintiffs *meant* to state another claim (or claims) beyond the one alleged for excessive fees. And in any event, Plaintiffs cannot "create a private right of action based upon ERISA reporting requirements," *Pappas v. Buck Consultants, Inc.*, No. 89 C 6137, 1989 WL 157517, at *4 (N.D. Ill. Dec. 12, 1989), *aff'd*, 923 F.2d 531 (7th Cir. 1991), which they concede in their briefs, [30] at 22.

14

Plaintiffs' duty of prudence claim suffers from the same defect as their excessive administrative fees claim. Beyond conclusory allegations that the amounts paid to Krol & Associates and Defendants Meltreger and Senese violated the duty of prudence, Plaintiffs point to the accounting expenses of two Chicago-area defined benefit plans, and then note their belief that an independent accountant did not review and approve these fees. [23] ¶¶ 191, 197. Plaintiffs also note that, in 2016 following a complaint, the DOL reached a settlement with Defendants and it continues to monitor the Severance Plan without taking further action. [23] ¶¶ 49, 187, 203; [28-4]. Such scant allegations fail to plausibly raise an inference that Defendants violated the duty of prudence by utilizing a legally flawed process in determining appropriate salaries, accounting expenses, and in reviewing their accountants work. *Twombly*, 550 U.S. at 570.

Having said this, despite Defendants' arguments to the contrary, Plaintiffs do possess standing to assert this claim. IfPlaintiffs can plausibly allege facts that Defendants' management incurred unreasonable or excessive fees, such actions would cause injury to Plaintiffs. *See McMaken on behalf of Chemonics Int'l, Inc. Employee Stock Ownership Plan v. GreatBanc Tr. Co.*, No. 17-CV-04983, 2019 WL 1468157, at *9 (N.D. Ill. Apr. 3, 2019). Obviously, the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks. *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016). If Defendants failed to ensure the Plans paid reasonable fees, that breach "necessarily shrunk Plaintiffs' investment by overpaying on administrative and investment fees." *Bell v. Pension Comm. of ATH Holding Co.*,

15

*LLC*, No. 115CV02062TWPMPB, 2019 WL 387214, at *8 (S.D. Ind. Jan. 30, 2019). For these reasons, this Court dismisses Count V without prejudice.

### V. Count VI

In Count VI, Plaintiffs claim Defendants refused to produce requested documents in violation of 29 U.S.C. §§ 1024(b)(1), 1024(b)(4), 1025(a), 1132(c)(1), and 1133(1) and (2). [23] ¶ 44–53, 210. Not so.

Once again, Plaintiffs cite irrelevant statutory sections. For example, § 1024(b)(1) requires Defendants to provide a copy of the summary plan description within 90 days after a new participant joins, and here, Plaintiffs already possess all relevant, available summary plan descriptions. [23] ¶ 41 (acknowledging "there is no SPD for the NPWU 401(k) Plan"); [23] (Ex. D). Likewise, § 1025(a) requires Defendants to furnish period "pension benefit statements," which Plaintiffs do not appear to be seeking or disputing. *See* [23] ¶¶ 207, 225, 226, 229. Meanwhile, § 1132(c)(1) only sets forth penalties for failing to provide periodic statements but does not impose any requirements, and § 1133(1)–(2) sets forth the procedures for a denial of benefits, not documents.[6]

The only relevant provision, § 1024(b)(4), mandates that the administrator "shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal

---

[6] Plaintiffs mistakenly contend that Defendants' denial of benefits required Defendants to produce any underlying documents associated with their decision under § 1133. [23] ¶ 52; [30] at 24–25. But § 1133 merely requires that Defendants provide a written explanation of any benefits denial. Nowhere within its text does §1133 entitle participants to underlying documents beyond the requisite written explanation. Thus, Plaintiffs fails to state a plausible claim for documents under § 1133.

report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." § 1024(b)(4). As to the scope of this provision, the Seventh Circuit has held that the catchall provision only applies to formal legal documents governing a plan. *Ames v. Am. Nat. Can Co.*, 170 F.3d 751, 758–59 (7th Cir. 1999). Plaintiffs, therefore, limit their claim under § 1024(b)(4), and only seek a remedy to the degree the documents they seek (e.g., "memoranda, policies, and other communications concerning the plan provisions relied upon by the Plans in making their decision"; "any documents provided the DOL related to its investigation," [23] ¶ 52) fall under the catchall provision for "instruments under which the plan is established or operated."

Despite the limitation to the § 1024(b)(4) catchall, the Second Amended Complaint remains deficient. First, it never clearly identifies which documents Defendants have failed to supply. Indeed, the most specific allegations merely state that Defendants "provided some but not most of requested documents," [23] ¶ 211, and "have not provided most of the requested documents," *id.* ¶ 212. Without clearly stating which documents Defendants failed to produce, Plaintiffs have failed to plausibly allege the requisite facts to support their claim. Likewise, the Second Amended Complaint also fails to provide any factual or legal support that the documents they seek constitute formal legal documents governing the NPWU Plans, as required by the Seventh Circuit. *Ames*, 170 F.3d at 758–59.

Accordingly, this Court dismisses Count VI without prejudice.

17

**VI.     Count VII**

Finally, Plaintiffs allege that "since at least 2015, the benefit statement sent to Plaintiffs . . . has not been written in a manner calculated to be understood by the average participant."  [23] ¶ 225.  ERISA § 1025(a)(1)(A)(ii) requires Defendants to send a benefit statement each calendar year.  This Court understands Plaintiffs' allegation to mean that the benefit statement they received *each year* since 2015 has been deficient.

Defendants challenge Count VII solely on the basis of timeliness, arguing that the statute of limitations bars Plaintiffs' claim.  [28] at 24.  A two-year statute of limitations governs ERISA claims.  *St. Alexius Med. Ctr. v. Roofers' Unions Welfare Tr.*, No. 14 C 8890, 2015 WL 5123602, at *5 (N.D. Ill. Aug. 28, 2015) (explaining that "statutory penalties under ERISA are penal in nature, and therefore [courts] will apply the two-year statute of limitations").  Here, most of Plaintiffs' claims are more than two-years old.  Nevertheless, Plaintiffs contend they should be able to bring claims for the statements within the statute of limitations as Defendants submitted a "fresh decision" with each deficient benefit statement constituting a "fresh violation." *Webb v. Gardner, Carton & Douglas LLP Long Term Disability Plan*, 899 F. Supp. 2d 788, 795 (N.D. Ill. 2012) (explaining that "the continuing-violation theory applies in this Circuit only when fresh decisions constituting fresh violations are made").  Here, Plaintiffs do not claim the continuing effects of a single alleged unlawful act under ERISEA in 2015, [34] at 24–25 (citing *Berger v. AXA Network LLC*, 459 F.3d 804, 816 (7th Cir. 2006)).  Rather, Plaintiffs claim that each deficient

18

benefits statement constitutes a separate, conceptually distinct statutory violation. Therefore, the two-year statute of limitations only time-bars Plaintiffs' claims under Count VII that arise out of benefit statements predating April 22, 2017, two years prior to the filing of this action. Therefore, this Court dismisses Count VII for all claims prior to 2017 with prejudice.

## CONCLUSION

For the reasons explained above, this Court grants in part and denies in part Defendants' motion to dismiss. [45]. This Court dismisses with prejudice Counts I, II, III, IV (as to reporting requirements and illegal transactions), and VII (for all claims prior to 2017), and dismisses without prejudice Counts IV (as to Plaintiffs' breach of fiduciary duty claims based upon excessive administrative fees), V, and VI. The Court denies the motion to dismiss as to Count VII for all claims in 2017 or thereafter.

Dated: November 24, 2020

Entered:

John Robert Blakey
United States District Judge